Filed 4/17/25 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MAURICE A. JACKSON,<br><br>     Defendant and Appellant. | A164679<br><br>(Contra Costa County<br>Super. Ct. No. 59007014)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[NO CHANGE IN THE JUDGMENT]** |

**BY THE COURT:**

It is ordered that the opinion filed herein on March 28, 2025, be modified as follows:

On page 3, the first two paragraphs of Background I. A. *Procedural History*, are deleted and the following two paragraphs are inserted in their place:

> In 1991, defendant and appellant Maurice Jackson was tried for and convicted of the first degree murders of three victims, Johnny Castaneda, Timothy Treas and Claudia Blackmon (Counts 1-3). About seven months after Jackson was convicted of these murders, the separate trial of Fred Amos and Donald Boston, who were alleged to have committed those murders along with Jackson, commenced, and they were convicted in March 1992.

In addition to the three murders, Jackson's jury also convicted him of two counts each of kidnapping for robbery of victims Castaneda and Treas (Counts 4-5), two counts each of first degree robbery of Castaneda and Blackmon (Counts 6-7), one count of second degree burglary of the mini-mart (Count 9), one count of first degree burglary of Castaneda and Blackmon (Count 10), unlawful taking of Castaneda's vehicle (Count 11), possession of a concealable firearm by an ex-felon (Count 12) and conspiracy to commit burglary, robbery and kidnapping (Count 13). The jury found true as to all counts the enhancement allegation that Jackson "used a handgun, a firearm." As to the murders of Castaneda and Treas, the jury found true allegations of robbery-murder, kidnap-murder and burglary-murder special circumstances. As to the murder of Blackmon, the jury found not true allegations of burglary and robbery special circumstances. The jury also found true the allegation of the multiple-murder special circumstance.

On page 7, in the second paragraph, beginning, "The evidence at trial," after the sentence ending "he and his cohorts had come to the station," add as footnote 4 the following footnote, which will require renumbering the footnotes after that:

[4] In a petition for rehearing, Jackson contended the evidence and inferences about Amos putting Castaneda in the trunk of Castaneda's car, Jackson holding Treas at gunpoint in the backseat of that car and Boston and Amos subsequently driving that car and the car Amos and his cohorts had arrived in (including that they arrived in a car) is unclear and subject to dispute. We disagree and decline to revise our factual recitation.

The evidence showed Amos and Boston lived in Richmond, California, whereas the mini-mart was in Vallejo, California; Amos arrived at the mini-mart with Jackson and Boston, where the three remained for 30 or 40 minutes; the three then left together through an alley that led to a separate parking lot and returned to the mini-mart together later that evening. At no point did Connor see anyone else with Amos, Boston and Jackson at any of the

times they came to and left the mini-mart on the night of the robbery.  When Castaneda and Treas arrived, Jackson was waiting in the alley and followed Treas as he entered the mini-mart with Castaneda.  The testimony of Stump and/or Connor indicated that Boston aimed the shotgun at Castaneda and Treas, Amos hit Castaneda hard on the head with the butt of his gun and Castaneda fell to the ground.  Jackson pointed his gun at Castaneda and Treas, and Treas put his hands up, saying, "Don't shoot."  After Stump and Conner had dropped to the ground, they heard what sounded like someone dragging Castaneda out the door of the mini-mart.  As Castaneda was being dragged out of the mini-mart, Connor heard Treas saying, "Don't shoot," as one or more of the three robbers cursed and directed him to "get out."  Boston approached Stump and Connor and told them to stay down and pointed the shotgun toward them.  Within a couple of minutes, Amos returned to the mini-mart and told Boston he had Castaneda in the trunk and Treas on the floor in the backseat with Jackson sitting on the seat holding a gun on Treas.  At that point, Jackson, Castaneda and Treas were not visible to Stump or Conner.  Amos told Boston to meet him somewhere.  Amos and Boston then left the mini-mart.  At some point, Stump heard the sound of Castaneda's car starting, and after Amos and Boston left the mini-mart, Connor heard the car leaving.  Castaneda's car with Treas's dead body in the trunk was found in Richmond, California a few days after the murders, whereas the bodies of Castaneda and Blackmon were found on the floor of the bedroom of their apartment in El Sobrante.

Finally, shortly after the murders, Stump received a call from Boston, Amos and Jackson, who were together at the time.

On page 33, in the paragraph that begins "In 1986" delete the indicator for footnote 10, which will eliminate the need to renumber the footnotes after that.

3

The Petition for Rehearing filed by appellant Maurice Jackson is denied.  There is no change in the judgment.


Dated:_____                              _____
                                                STEWART, P.J.

4

Trial Court:  Contra Costa County Superior Court

Trial Judge:  Hon. Charles B. Burch

Counsel:

James S. Donnelly-Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Bridget Billeter and Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>MAURICE A. JACKSON,<br><br>          Defendant and Appellant. | A164679<br><br>(Contra Costa County<br>Super. Ct. No. 59007014) |

Defendant and Appellant Maurice Jackson appeals from the denial of his resentencing petition, claiming that under the current law of murder he could not be convicted of the three murders for which he was tried and convicted in 1991 and thus is entitled to be resentenced under Penal Code section 1172.6.[1]

As to two of the murders (of victims Castaneda and Treas), the trial court held the record of conviction established as a matter of law that Jackson was not entitled to resentencing and denied the petition at the prima facie stage without issuing an order to show cause or conducting a hearing. As to the third murder (of victim Blackmon), the court issued an order to show cause and accepted further briefing but, because neither the People nor Jackson offered new or additional evidence, declined to hold a hearing and denied the petition on the briefs. Based primarily on the trial record, the trial court found Jackson was guilty of the Blackmon murder beyond a reasonable doubt.

---

[1] Further undesignated code references are to the Penal Code.

6

Jackson contends the trial court erred in denying his petition as to the Castaneda and Treas murders at the prima facie stage, arguing the trial court erred in holding the jury's special circumstance findings as a matter of law established all the elements of murder under a currently valid theory. In particular, he contends that the court's reliance on the special circumstance findings failed to address all of the current requirements for felony murder under current section 189, subdivision (e)(2) (section 189(e)(2)), which he contends now requires that the defendant not only aid and abet the underlying felonies with intent to kill but that he aid and abet the killing itself. Jackson also challenges the court's denial of the petition as to the murder of Blackmon after issuing an order to show cause, arguing, among other things, that the court prejudicially erred in failing to hold a hearing and there was insufficient evidence to support its finding beyond a reasonable doubt that he is guilty of murder under a currently valid theory.

The People contend the trial court did not err in dismissing the petition as to the Castaneda and Treas murders and holding defendant was ineligible for relief as a matter of law.[2] The People agree with Jackson that the trial court erred in declining to hold a hearing regarding the Blackmon murder but argue that error, and certain other errors pertaining to the Blackmon murder, were harmless. Further, the People argue there was no error in the trial court's conclusion that, applying the current law of murder to the evidence in the record, Jackson committed the murder of Blackmon beyond a reasonable doubt.

We conclude the trial court's denial of the petition at the prima facie stage as to the murders of Castaneda and Treas was error and that it was prejudicial. We therefore reverse the trial court's ruling that the record of conviction demonstrates as a matter of

[2] The People originally conceded that the trial court's failure to issue an order to show cause and hold an evidentiary hearing on the Castaneda and Treas murders was error requiring a remand for further proceedings, although it did not address the theory of murder on which the trial court relied.

7

law that Jackson is guilty of those two murders under a currently valid theory and remand for a hearing on whether the record and any new evidence that may be offered establish beyond a reasonable doubt that Jackson is guilty of those two murders under a currently valid theory.

We agree with both parties that the trial court's failure to hold a hearing on the Blackmon murder was erroneous and conclude that the error was not harmless. We reject some of Jackson's other procedural challenges to the trial court's ruling on the Blackmon murder. We remand for the trial court to hold a hearing on whether the evidence demonstrates beyond a reasonable doubt that Jackson is guilty of Blackmon's murder. Because we remand for the trial court to hold a hearing, however, we do not address Jackson's contentions that the court's finding him guilty of Blackmon's murder is not supported by substantial evidence and that the jury's rejection of the robbery and burglary special circumstances (but not the multiple murder special circumstance) as to Blackmon operate as issue preclusion barring a finding that he was guilty of her murder.

## BACKGROUND

### I.

**A.** *Procedural History*

In 1991, defendant and appellant Maurice Jackson was tried for and convicted of the first degree murders of three victims, Johnny Castaneda, Timothy Treas and Claudia Blackmon (Counts 1-3). At the same time Jackson was tried for these murders, Fred Amos and Donald Boston, who were alleged to have committed those murders along with Jackson, were tried in a separate case.

In addition to the three murders, Jackson's jury also convicted him of two counts each of kidnapping for robbery and first degree robbery for victims Castaneda and Treas (Counts 4-7), one count each of commercial and residential burglary (Counts 9-10), unlawful taking of a vehicle (Count 11), possession of a firearm by an ex-felon (Count

8

12) and conspiracy to commit burglary, robbery and kidnapping (Count 13). The jury found true as to all counts the enhancement allegation of personal use of a firearm. As to the murders of Castaneda and Treas, the jury found true allegations of four special circumstances (robbery-murder, kidnap-murder, burglary-murder and multiple murder). As to the murder of Blackmon, the jury found not true allegations of burglary and robbery. As to all three victims, the jury found true the allegation of the multiple-murder special circumstance.

At the penalty phase trial, the jury fixed the penalty for each of the three murders (counts 1 through 3) at life without the possibility of parole. The trial court sentenced Jackson to three consecutive terms of life without parole, and a term of six years on one of the first degree robbery counts (count 7), a term of three years on the possession of a firearm by a felon (count 12), and added two years to count 1 for the enhancement of personal use of a firearm for one of the murder counts and one year to count 7 for a prior felony. The sentences on counts 7 and 12 were to run concurrently with the murder sentences. The sentences for other counts, including enhancements, were stayed.

In 1993, this court affirmed the judgment on direct appeal. In 2017, Jackson filed a petition for habeas corpus asserting that the record indicated the jury did not find he was the actual killer and his first degree murder convictions were therefore necessarily based on a natural and probable consequences theory that was no longer valid in light of *People v. Chiu* (2014) 59 Cal.4th 155. The superior court denied the petition on the ground that the murder convictions were based on evidence that Jackson had intent to kill and on direct aiding and abetting, which remained a valid theory after *Chiu*. Jackson filed a similar petition in this court, which we denied for the same reasons.

9

In July 2020, Jackson filed a petition in propria persona seeking resentencing of his murder convictions under former section 1170.95 (now section 1172.6).[3] After appointing counsel for Jackson and receiving briefing, in December 2020 the trial court denied the petition without issuing an order to show cause as to the murders of Castaneda and Treas on the ground that the jury's true finding on the felony-murder special-circumstance findings for those murders indicated it found Jackson was the actual killer or participated in the felonies with the intent to kill. The trial court relied on the summary of the facts in our 1993 opinion affirming Jackson's conviction, and did not examine the trial transcripts. The court concluded that the jury's special circumstances findings that Jackson was either the actual killer or had aided and abetted killings or conspired to kill, while harboring the intent to kill rendered him ineligible for resentencing relief as to the Castaneda and Treas murders as a matter of law. The court also relied on this court's holding on Jackson's direct appeal that there was sufficient evidence to sustain a finding that Jackson had the intent to kill.

The court issued an order to show cause as to the murder of Blackmon. The People filed a brief arguing, based on the trial record in Jackson's case, that Jackson was not entitled to resentencing as to the Blackmon murder. Jackson filed a response that also relied on the trial record without proffering additional evidence. Jackson requested to be present at the hearing, but the trial court held that because neither party was seeking to present additional evidence an oral hearing was unnecessary. In December 2021, the court denied the petition for resentencing for the murder of Blackmon.

**B. *Summary of Trial Evidence***

The trial record in this case is voluminous. The People called more than 50 witnesses and presented more than 75 exhibits. David Conner and David Stump were the

---

[3] Former section 1170.95 was subsequently renumbered section 1172.6 and, for convenience, we will refer to it by its current number.

primary witnesses for the People, providing much of the direct evidence in the case. They witnessed the robbery and, in a limited way, the kidnapping that preceded the murders. But they were not present for the murders.

The only living witnesses to the murders were Jackson and his cohorts, Amos and Boston, none of whom testified at the trial. Thus, while direct evidence established the roles of the three perpetrators in the robbery and kidnapping, their roles in the ensuing murders were based on the extensive circumstantial evidence, including ballistics evidence, blood evidence and records and testimony about telephone calls made from and to victim Castaneda's cell phone before and after the murders, the timing of those calls, the location of the phone when the calls were made and whether the calls were made to or received from persons who knew Castaneda only or persons who knew Jackson but not Castaneda.

We have reviewed the testimony of all witnesses who testified at Jackson's trial and the other parts of the trial court record that are part of the record on this appeal. We describe the facts here in summary fashion since we do not at this juncture rule on Jackson's substantial evidence challenge.

The evidence at trial and reasonable inferences from it tell the following story. On December 6, 1989, three men, two of whom were half brothers (Jackson and Boston) and one who was their cousin (Amos), all armed with guns, robbed a man (Castaneda) who had come to a gas station and mini-mart where a friend of his (Stump) worked. Castaneda came to the station with another friend (Treas), with the understanding he was going to sell four ounces of powdered cocaine to someone Stump had told him wanted to buy it. Instead, when he and Treas arrived, Jackson, who had been waiting outside, followed them into the mini-mart, and when Castaneda put a hip bag containing the drugs on the counter, Jackson, Boston and Amos pulled out guns (two of which Amos had previously borrowed from Stump), Amos hit Castaneda hard on the head with the butt of

11

his gun, leaving blood, Stump and his co-worker Connor dropped to the floor behind the counter, and Amos and dragged Castaneda out of the mini-mart and put him in the trunk of Castaneda's Toyota Camry, while Jackson forced Treas at gunpoint to get into the back seat. Boston drove away in the Camry with Castaneda in the trunk and Jackson holding Treas at gunpoint in the backseat. Amos left in the car in which he and his cohorts had come to the station. Before leaving, he and Boston told Stump and Connor they "didn't see anything," told Connor to "keep [his] mouth shut" and threatened to kill him or his family if he said anything. Amos also told Stump to call Castaneda's girlfriend, Blackmon, and tell her Castaneda had never arrived. Boston left the sawed-off shotgun Amos had borrowed from Stump in the mini-mart, but Amos, who had been using Stump's nine-millimeter Smith & Wesson semi-automatic took that gun with him.

While they were at the gas station and before Castaneda and Treas had arrived, Jackson bragged about having killed someone, pointed at Connor with his gun and demanded that he open the gas station safe, saying he wanted to kill a white person and just wanted to kill somebody. Boston dissuaded him from following through with the threat against Connor, who was not forced to open the safe. Also, before the robbery, while Amos, Boston and Jackson, along with Stump and Connor, were in the mini-mart together, Stump expressed concern upon realizing Amos and his cousins were intending to rob Castaneda, but Boston told Stump not to worry about it, that "they'll" or "he'll" "be dead after tonight anyways."

After the robbery, Stump and Connor closed the gas station for the night and went to the home Stump shared with his girlfriend, where Connor was also staying. Stump, who like Connor was scared, called Blackmon as Amos had instructed him and told her Castaneda had never arrived. She did not sound scared and responded by saying, "Well you know how Johnny is always late."

12

About an hour to 90 minutes later, Connor told Stump that there was a phone call for him.  Boston was on the phone, and told Stump, "You don't know nothing."  When Stump asked what had happened, Boston said, "Just don't worry about it."  The phone clicked off and rang again, and when Stump picked up, he spoke with Amos.  He asked Amos what had happened, and Amos, like Boston, said, "Don't worry about it" and "You don't know nothing."  Next, Jackson got on the line and repeated, "you don't know nothing," and said something like "it's everyone for themselves."

Stump and his girlfriend tried to call Castaneda and Blackmon in the days after the robbery but were unable to reach them.  A close friend of Castaneda's, who Castaneda had agreed to pick up on his way back from the drug sale in Vallejo, did not hear from Castaneda that evening and was unable to reach him then or in the following days.

On December 10, 1989, four days after the robbery, police found Treas, dead, in the trunk of Castaneda's car, which was parked in the carport of an apartment complex in Richmond.  The car had an area of dried blood on it, and there was a lot of blood under Treas in the trunk and some blood on other parts of the car.  Treas had been shot in the head at close range.  Treas's wallet and a card with his blood on it were in the trunk.  The card had directions for retrieving information from a cell phone that had belonged to Castaneda but was not found in the car.  There was a plastic cellphone charging stand on the left front floorboard inside the car and papers bearing Castaneda's name in the glove box.

The vehicle with Treas in the trunk led police to the apartment where Castaneda had been living with Blackmon.  The apartment manager who let them in told them she had not seen either Castaneda or Blackmon since December 6, though she had left them a note on the door on December 7 about a package that had been delivered for them.

The law enforcement officers observed blood on the walkway and porch and the manager's note, which was still on the door.  Inside the apartment, police found

13

Castaneda and Blackmon, each lying face down on opposite sides of the bed, having been shot multiple times. Blackmon was in her night clothes and partially wrapped in a sheet. In the bedroom, a telephone cord had been ripped out of the jack, and drawers and cabinets in the furniture had been left open. A substantial amount of cocaine Castaneda had purchased beyond what he had taken to sell at the mini-mart was missing from the apartment, as was a pair of nine-millimeter semi-automatic pistols with 30-round clips he had kept in a cabinet next to his and Blackmon's bed.

Forensic evidence indicated that at least two guns were used in the murders, one of which had ammunition consistent with the Smith & Wesson Amos had borrowed and failed to return to Stump and the other of which had ammunition consistent with guns of the type missing from Castaneda's apartment. All three victims had been shot in the head from back to front, at relatively close range and at a downward trajectory.

Blood on and in the Camry was consistent with Treas and Castaneda's blood types. Blood in the parking area of the gas station where the Camry had been parked during the robbery and blood on the doorstep of the apartment was consistent with Castaneda's.

Two weeks after the murders, Jackson pawned a gold nugget ring with a diamond that had been removed from Castaneda's hand on the night of the murders. He had pawned other jewelry, some of which a friend of Castaneda identified as his.

Cellphone records showed that after the murders, Jackson had used Castaneda's phone to call people he knew and people he knew had called him on it as well. The records and other evidence also indicated that the murders had taken place on the same night as the robbery because calls made to people known by Castaneda and Treas had stopped that night, and calls were made to people Jackson knew after that.

14

**DISCUSSION**

**I.**

**LAW GOVERNING RESENTENCING UNDER SECTION 1172.6**
A. *Resentencing Under Section 1172.6*

"Senate Bill [No.] 1437 [2017-2018 Reg. Sess.] altered the substantive law of murder in two areas. First, with certain exceptions, it narrowed the application of the felony-murder rule by adding section 189, subdivision (e) to the Penal Code. Under that provision, 'A participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.[4] [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' (§ 189, subd. (e).)

"Second, Senate Bill [No.]1437 [(2017-2018 Reg. Sess.)] imposed a new requirement that, except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder. (§ 188, subd. (a)(3).) 'Malice shall not be imputed to a person based solely on his or her participation in a crime.' (*Ibid*.) One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine. [Citation.] '[U]nder the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or

---

**4** As we shall discuss, the meaning of section 189(e)(2) has been the subject of conflicting opinions within the California Court of Appeal, and that conflict has a bearing on the trial court's denial of the petition for resentencing on the Castaneda and Treas murders.

she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the "natural and probable consequence" of the crime the accomplice aided and abetted (i.e., the nontarget offense). [Citation.] A nontarget offense is the natural and probable consequence of a target offense "if, judged objectively, the [nontarget] offense was reasonably foreseeable." [Citation.] The accomplice need not actually foresee the nontarget offense. "Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' " ' [Citation.] Thus, under prior law, a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault. [Citation.] The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime. [Citation.] Senate Bill [No.] 1437 [(2017-2018 Reg. Sess.)] ended this form of liability for murder." (*People v. Curiel* (2023) 15 Cal.5th 433, 448-449.)

Third, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) "created a path to relief for defendants who had previously been convicted of murder on a felony-murder [or natural and probable consequences] theory but who could not have been convicted under the new law. Resentencing is available under [section 1172.6] if the defendant neither killed nor intended to kill and was not 'a major participant in the underlying felony [who] acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2.' " (*People v. Strong* (2022) 13 Cal.5th 698, 703, quoting § 189, subd. (e)(3).)

"Under section 1172.6, a person who was convicted of murder, attempted murder, or voluntary manslaughter under the prior law may file a petition 'to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on

16

any remaining counts. . . .' (§ 1172.6, subd. (a).)" (*People v. Davis* (2024) 107 Cal.App.5th 500, 508-509.) The petitioner is entitled to counsel, if requested, on the filing of a facially sufficient petition. (*People v. Lewis* (2021) 11 Cal.5th 952, 970 (*Lewis*).) In assessing whether the petitioner has made a prima facie showing, the trial court can and should rely on the record of conviction. (*Lewis*, at pp. 970-971.) "[T]he prima facie inquiry under [section 1172.6,] subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition" then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Id.* at p. 971.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id.* at p. 972.)

" 'If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause ([§ 1172.6,] subd. (c)) and 'shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner . . . .' (*id.*, subd. (d)(1))." (*People v. Davis*, *supra*, 107 Cal.App. 5th at p. 509.) At that " 'hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.' (§ 1172.6, subd. (d)(3).)" (*Ibid.*)

17

"The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

## B. *Standard of Review*

We apply de novo review on appeal from the court's denial of a petition for resentencing at the prima facie stage, including its determination that the record of conviction establishes the petitioner is not entitled to resentencing as a matter of law. (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251-1252; *People v. Lovejoy* (2024) 101 Cal.App.5th 860, 865.) We thus apply de novo review to the trial court's denial of Jackson's petition for resentencing on the murders of Castaneda and Treas.

Where a trial court denies resentencing after issuing an order to show cause (OSC) and conducting a hearing, we review its legal determinations de novo and its factual findings for substantial evidence. To the extent Jackson contends the trial court erred in its interpretation of the law or misapplied the law to the facts, we review its decision to

18

deny resentencing regarding the Blackmon murder de novo. (*Lewis, supra,* 11 Cal.5th at p. 961; *People v. Hill* (2024) 100 Cal.App.5th 1055, 1066.) However, to the extent he challenges the trial court's factual findings, we review those findings for substantial evidence. (See *People v. Underwood* (2024) 99 Cal.App.5th 303, 314 (*Underwood*) [finding that the petitioner acted with an intent to kill or reckless indifference to human life]; *People v. Clements* (2022) 75 Cal.App.5th 276, 301 [finding whether petitioner acted with reckless indifference to human life].)

## II.

### TRIAL COURT'S ORDER
### A. *Prima Facie Stage Denial As to Castaneda and Treas Murders*

In denying Jackson's petition for resentencing on the Treas and Castaneda murders at the prima facie stage, the trial court agreed with Jackson that he had established the first and second elements of a prima facie case under section 1172.6, subdivision (a): that a complaint was filed against him that allowed the People to proceed under theories of felony murder or natural and probable consequences murder (§ 1172.6, subd. (a)(1)) and that he was convicted of murder based on the jury instructions that included those theories (*id.*, subd. (a)(2)). However, the court held Jackson had failed to make a prima facie showing that he could not be convicted of first degree murder under the current murder statutes.

As the trial court explained it, "the court has reviewed the portions of the record of conviction that show indisputably that the jury must have found as to Counts 1 and 3 [the Castaneda and Treas murders] that the Petitioner was either the actual killer or that he engaged in the special circumstance felony murders with malice aforethought, that is, intent to kill. In this case, the jury was instructed that it could not convict the Petitioner of a special circumstance unless he either was the 'actual killer' or participated in the special circumstance felony with intent to kill. The jury convicted the Petitioner of the

19

special circumstance allegations charged in Counts 1 and 3. . . . [¶] In convicting the Petitioner of the special circumstance charges in Counts 1 and 3, the jury must have found, if they followed the jury instructions, that the Petitioner was either the actual killer or participated in the felony-murder offenses with the intent to kill. . . . [T]he jury's finding the special circumstance allegations to be true necessarily included a finding that Jackson killed the victims named in Counts 1 and 3, or that he acted with the intent to kill when he aided and abetted in the commission of robbery and burglary as charged in those counts."

## B. *Denial As to Blackmon Murder After OSC*

After issuing an order to show cause as to the Blackmon murder, the trial court considered whether the evidence at trial demonstrated beyond a reasonable doubt that Jackson "committed murder as that offense is now defined in sections 188 and 189 of the Penal Code." It did so without holding a hearing, concluding that because neither Jackson nor the People proffered any additional evidence a hearing was unnecessary.

The court reviewed the evidence[5] and considered the findings made by the jury as reflected by the instructions and verdicts. It found, first, "that the Petitioner, while acting in reckless disregard of Ms. Blackmon's life, was a major participant in both the burglary of Ms. Blackmon's apartment and the robbery of belongings from her immediate presence." In so finding, the court applied the standards for reckless indifference and major participation adopted by the California Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522.[6]

---

[5] The trial court reviewed our opinion on direct appeal and the trial transcript, confirmed that this court's summary in the opinion was accurate and identified additional facts in the transcript pertinent to the issue of Jackson's guilt for the Blackmon murder.

[6] The court rejected Jackson's argument that the jury's not true finding on the felony-murder special circumstances operated to preclude it from making these findings because "[t]he trial jury was never instructed on this particular theory of liability[, which] was not a legally authorized basis for a murder conviction at that time."

20

Second, the court found "that the evidence establishes beyond a reasonable doubt that the Petitioner remains liable for a murder [of Blackmon] as an aider and abettor who acted with either express or implied malice." In so finding, the court recognized that the jury had found not true the felony-murder special circumstances as to Blackmon, which "reflected its possible reasonable doubt with regard to whether the defendant intended to kill Ms. Blackmon" but concluded that part of the verdict did not preclude it from finding that he did act with implied malice. It reached this conclusion by observing that the jury found Jackson guilty of the crimes of robbery and burglary of Blackmon, which could either reflect doubt about Jackson's intent to kill Blackmon or reflect a logical inconsistency with its not true findings on the felony-murder special circumstances alleged as to the Blackmon homicide. Based on *People v. Lewis* (2001) 25 Cal.4th 610, 656 and *People v. Covarrubias* (2016) 1 Cal.5th 838, 890-891, the court applied the rule that "[n]otwithstanding the inconsistencies that may arise from separate parts of a verdict, a count of conviction stands so long as the evidence supporting that particular conviction is sufficient."

### III.
### JACKSON'S CLAIMS OF ERROR IN THE TRIAL COURT'S DENIAL OF RESENTENCING FOR THE MURDER OF BLACKMON AFTER ISSUING AN ORDER TO SHOW CAUSE

### A.    *Jackson's Argument That We Should Review De Novo Fails.*

Jackson urges us to apply de novo review to the trial court's factual findings regarding the Blackmon murder based on factors identified by our high court in *People v. Vivar* (2021) 11 Cal.5th 510, which held de novo review applies to decisions under section 1473.7 for failure to advise a defendant of the immigration consequences of a plea. We rejected the same argument recently in *Underwood, supra*, 99 Cal.App.5th at pages 313-314, observing that "appellate courts that have considered this argument have

21

uniformly rejected it, and we agree with their analysis. (See, e.g., *People v. Njoku* (2023) 95 Cal.App.5th 27, 43; *People v. Werntz* (2023) 90 Cal.App.5th 1093, 1110, review granted August 9, 2023, S280278; *People v. Oliver* (2023) 90 Cal.App.5th 466, 480; *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232-233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591; [*People v.*] *Clements*, *supra*, 75 Cal.App.5th at p. 301.)"

Moreover, as the People point out, these decisions are supported by *People v. Perez* (2018) 4 Cal.5th 1055, 1066, in which our Supreme Court addressed a motion to recall sentence under the Three Strikes Reform Act of 2012 (Prop. 36), which entails a procedure similar to the one the Legislature later adopted in Senate Bill 1437. (See *Perez*, at p. 1062.) The court held that "the trial court's eligibility determination, to the extent it was 'based on the evidence found in the record of conviction,' is a factual determination reviewed on appeal for substantial evidence." (*Id*. at p. 1066.)

We agree that *People v. Perez* is analogous and the applicable standard of review for factual findings made in a section 1176.2 hearing is substantial evidence.[7]

## B. *The Trial Court's Failure to Hold a Hearing As to the Blackmon Murder Was Prejudicial Error.*

Jackson also attacks the trial court's decision regarding the Blackmon murder on the basis of procedural error, arguing the court's failure to hold an evidentiary hearing at which Jackson could be present was error. Section 1172.6, subdivision (d)(1) provides that after a court determines the petitioner has made a prima facie case and issued an order to show cause, it "shall hold a hearing to determine whether to vacate the murder, attempted

---

[7] Jackson also argues we should apply de novo review for other reasons but cites no authority. None of these arguments persuade us.

murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." Section 1172.6, subdivision (d)(3) provides in part that at the hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." The same provision further provides that "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law" and that "[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."

After counsel for Jackson and the People indicated they did not anticipate offering any new evidence, the court noted that it anticipated the hearing would consist simply of counsels' argument about the trial evidence. Noting there had been difficulties with the Department of Corrections and Rehabilitation in connection with Zoom hearings, the court stated it would set a date at which counsel could present argument on "the evidence and what the evidence signifies" but "I don't think that the defendant's presence is necessary for that." Later, the trial court indicated it was not inclined to hold a hearing at all, stating that arguments should be made in the parties' briefs. Thereafter, defense counsel, having been able to talk with his client, informed the court that Jackson "would like to be present" and suggested "we can do that remotely via Zoom." After asking why a hearing was needed, defense counsel responded, "I was planning on arguing the case orally." The court, noting there had been several continuances that delayed the proceedings by nine months and, in the court's view, "there's no need for any

23

in-court hearing absent the parties—one or both of the parties telling me there's an agreement that new and additional evidence is going to be presented." The court further stated, "I don't see any reason for us to have to worry about Mr. Jackson being here via Zoom or in person. . . . And I don't understand . . . [section 1172.6] to require an in-court hearing for counsel to argue something, i.e., what the evidence at trial had shown." Defense counsel argued that "the hearing is a critical stage of the proceedings at which Mr. Jackson has a right to be present, given that the Court is making factual findings . . . ." The court stated it would not conduct a hearing "where the parties simply argue what the evidence at trial proved."

The People concede that the failure to hold a hearing violated Jackson's right to personal presence and due process. We agree. (See §1172.6, subd. (d); *People v. Basler* (2022) 80 Cal.App.5th 46 (*Basler*) [petitioner has statutory and constitutional right to be present at evidentiary hearing]; *People v. Quan* (2023) 96 Cal.App.5th 524, 533-534 (*Quan*).)

As the People acknowledge, in *Basler*, *supra,* 80 Cal.App.5th 46, the court held that a defendant who petitions for resentencing under section 1176.2 and makes out a prima facie case is entitled to be present at the evidentiary hearing. (*Basler,* at pp. 57-59.) The right to a hearing is provided by statute. (§ 1172.6, subd. (d)(1).) The statute provides that the hearing is mandatory. (*Ibid.* [within 60 days after issuance of order to show cause, court "shall hold a hearing to determine whether to vacate" conviction and recall sentence].) It allows the parties to present new evidence but does not condition the obligation to hold a hearing on whether new evidence will be presented. (*Id.*, subd. (d)(3).)

The defendant's " 'right to be personally present [at a hearing] "where necessary to protect [his] opportunity for effective cross-examination, *or to*

24

*allow him to participate at a critical stage and enhance the fairness of the proceeding*" ' " is "guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution, as well as article 1, section 15 of the California Constitution." (*Basler*, *supra,* 80 Cal.App.5th at p. 57, italics added.)  Relying on numerous California Supreme Court and Court of Appeal decisions holding resentencing hearings of various kinds are a critical stage of a defendant's prosecution at which the defendant is entitled to be present, the *Basler* court held the hearing prescribed by section 1172.6, subdivision (d) is " 'akin to a plenary sentencing hearing' and thus a 'critical stage' in the criminal process even though it prevents imposition of a sentence greater than that originally imposed." (*Basler,* at p. 58; accord, *Quan*, *supra,* 96 Cal.App.5th at pp. 533-534.)  The right attaches, the *Basler* court held, once the petitioner had made a prima facie case of eligibility. (*Basler*, at pp. 58-59.)

In *Basler* and in *Quan*, the trial courts had held hearings at which neither side had proffered new evidence, but the defendants were neither present nor waived their right to be present. (*Basler*, *supra*, 80 Cal.App.5th at p. 56; *Quan*, *supra*, 96 Cal.App.5th at pp. 530-531, 535.)  Notwithstanding that there was " 'no indication in the record that the defense ever contemplated having [Basler] testify or presenting other evidence' " (*Basler*, at p. 56), the court held he had a constitutional right to be present " ' "to allow him to participate at a critical stage and enhance the fairness of the proceeding." ' " (*Id*. at p. 57.)

25

After concluding that holding the hearing without Basler present violated his constitutional rights, the court addressed the issue of prejudice,[8] applying the *Chapman* standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) The question of prejudice under *Chapman* is whether the court can conclude beyond a reasonable doubt that deprivation of the right did not affect the outcome of the proceeding. (*Basler*, *supra*, 80 Cal.App.5th at p. 59.) Basler argued that he "should be given the opportunity to hear the People's evidence and then decide whether to exercise his right to testify and present other evidence." (*Ibid*.) The court agreed and observed, "The question may well turn on disputed issues of fact 'about which [Basler]—as a participant in the events in question—may well have had something to say.' " (*Ibid*.) While " '[t]he trial court may or may not have chosen to believe what [Basler] might have said, if he said anything,' " the court stated it could not " 'conclude beyond a reasonable doubt that his presence at the hearing would not have affected the outcome.' " It went on to point out that, "[a]part from presenting evidence, [Basler] may have given input to his counsel on the People's presentation and arguments, resulting in his counsel drawing different inferences from the trial evidence or doing more than submitting on the papers." (*Id*. at p. 60; see also *Quan, supra*, 96 Cal.App.5th at p. 536.) Ultimately, the court agreed Basler was "entitled to hear the People's evidence and argument on the point, then decide whether to testify and/or present additional or new mitigating evidence on his behalf." (*Basler*, at p. 60.)

---

[8] The *Basler* court also addressed whether the petitioner had waived his right to be present. The People do not contend that Jackson waived his right and we therefore need not discuss waiver.

26

The People concede that Jackson "was denied both a live hearing and the right to be present at it" and that this violated his constitutional rights. They take no issue with the decisions in *Basler* and *Quan* and acknowledge that harmless error must be analyzed under *Chapman*. However, they claim the error was harmless beyond a reasonable doubt as demonstrated by the trial court's ruling that "oral argument was unnecessary and that a written presentation would be more helpful." We cannot agree that the error was harmless under *Chapman*.

The People's arguments understate the significance of the right Jackson was denied in this case. The hearing after a prima facie case has been established in a section 1172.6 resentencing proceeding requires the trial judge to review the entire trial record and determine whether the evidence demonstrates beyond a reasonable doubt that the petitioner is guilty of murder as murder as now defined, even when elements of a current murder theory were not necessarily resolved by the jury at petitioner's trial. The trial judge's role is to act as an independent trier of fact to decide factual issues necessary to make that determination. Precisely because the law has changed, the trial evidence and the inferences to be drawn from it in most cases will not have been presented with a focus on a mens rea or an actus reus that meet the requirements of current law. Moreover, in evaluating the evidence on issues the jury did not necessarily decide, the trial court may consider such matters as witness credibility and the weight of the evidence to the extent the record, cold as it is, sheds light on them.

This case, which was tried more than 30 years ago, has all of these complexities. The trial predated even the felony-murder special circumstance that was later incorporated into the murder statute by Senate Bill 1437, not to mention the new elements that were required by the Senate Bill. Thus,

27

the jury was not instructed and made no findings on elements that were not then included in the special circumstance, much less the elements added even more recently by the Senate Bill. Further, the jury was instructed on several different murder theories, including premeditated murder, felony murder, aiding and abetting and conspiracy to commit either of those types of first degree murder. The law governing felony murder was substantially revised by Senate Bill 1437. Complicating matters still further, the aiding and abetting and conspiracy instructions the jury received incorporated the natural and probable consequences doctrine for conspirators and aiders and abettors, which is no longer a valid murder theory under current law.

It is not clear whether the jury found Jackson was the actual killer, that he intended to kill Blackmon or both. Further, because the victims were the only witnesses to the murderous acts and the ballistics evidence was less than definitive as to any single defendant, it is impossible to discern with certainty which of the defendants killed which victim.

Notwithstanding these complexities, after issuing the OSC and receiving briefing, the trial court made findings on the major participant/reckless indifference theory that is now, but was not at the time of trial, a basis for felony murder committed by an accomplice. To do so, it had to make factual findings on intent and actus reus that the trial jury was not called upon to decide. The court also found, in the alternative, that Jackson aided and abetted the murder of Blackmon with express or implied malice.

We point out these aspects of this resentencing case not to criticize the judge or his findings (or to express any opinion about them) but rather to emphasize the enormity and complexity of the task he faced. Precisely because of the difficulty of evaluating trial records that are often decades old

28

in the light of significant legal changes, the arguments of counsel and the presence of the defendant can be critical to judges deciding these issues and to the fairness of the proceeding for the defendant. Where factual and legal issues must be resolved, a hearing enables the court to inform counsel and the parties of its tentative thoughts and allows them, in turn, to respond and potentially to present a different point of view, about both the significance of the evidence and how the law applies to it. In particular, as *Basler* pointed out, the petitioner may have insight into the evidence and the inferences to be drawn from it because he or she was present at the trial and is familiar with the evidence. At the hearing, the petitioner will hear the People's presentation, may provide perspective to his or her counsel and may decide to testify on issues that could be critical to whether his or her sentence will be reduced. (See *Basler*, *supra*, 80 Cal.App.5th at pp. 59-60.)

For all these reasons, like the courts in *Basler* and *Quan*, we cannot say that failing to hold the hearing, allow arguments from counsel and allow Jackson to decide whether to testify after hearing the People's presentation, was harmless beyond a reasonable doubt. We therefore remand the resentencing petition as to the Blackmon murder for the trial court to conduct an evidentiary hearing, whether or not the parties anticipate presenting new evidence, at which counsel may argue and consult with his client and Jackson may, after hearing the arguments, choose to testify. After holding such hearing, the trial court may, but is not required, to withdraw or revise its decision.

C.  ***Jackson's Substantial Evidence and Issue Preclusion Challenges***

Having determined that remand for an evidentiary hearing is required, we do not address Jackson's substantial evidence and issue preclusion challenges to the trial court's

findings as to the murder of Blackmon at this juncture. For purposes of guidance on remand, our discussion of the actus reus requirement for felony murder liability of non-killers under section 189(e)(2) below should inform any consideration of that murder theory in the context of the Blackmon murder, as well as the Castaneda and Treas murders, on remand.[9]

## IV.

## JACKSON'S CLAIM THAT THE TRIAL COURT ERRED IN FAILING TO ISSUE AN ORDER TO SHOW CAUSE AND HOLD A HEARING ON THE CASTANEDA AND TREAS MURDERS

### A. *The Record of Conviction and the Trial Court Ruling*

---

[9] The People agree, as do we, that the trial court erred in considering the record in the separate trial of Amos and Boston and the appellate opinion in that case. It does not appear that the People proffered those materials as evidence, and there is no indication that, prior to considering any part of the *Amos/Boston* record, the court assessed whether evidence at that separate trial in a case to which Jackson was not a party was admissible in Jackson's case or whether it violated his constitutional right to confront witnesses. (See § 1172.6, subd. (d)(3) [admission of evidence shall be governed by the Evidence Code].) We need not decide whether the error was harmless, as the People contend, since we are remanding for a hearing at which we presume the court will not rely on any evidence from the trial record in the *Amos/Boston* case without it being proffered by one of the parties and its admissibility properly assessed by the court if objected to.

We do not find error in the trial court's use of the appellate opinion on Jackson's direct appeal, since the court stated it had reviewed the trial record and found the appellate court's recitation "thorough and accurate." We do not interpret the court as suggesting it relied on the appellate opinion in lieu of the trial transcript. Rather, the court used it as an accurate and convenient summary and specifically identified record evidence not described in the appellate opinion that supported its conclusions.

We reject Jackson's request that we assign a different judge to hear the petition on remand. We find no bias on the part of the judge as a result of considering materials that are likely inadmissible. Nor does the finding Jackson identifies as inaccurate (that the killing of Treas was at the same apartment complex as the other killings and therefore contemporaneous with them) suggest bias. On the contrary, as the trial court proceedings were continued several times, and the trial record is voluminous and included a substantial amount of circumstantial evidence, there is no reason to presume the error was other than inadvertent.

30

The jury was instructed on two basic theories of direct liability for first degree murder, premeditated murder and felony murder. It was also instructed on accomplice liability generally, and for felony murder. The general aiding and abetting instruction and the felony-murder conspiracy instruction included natural and probable consequences theories. These instructions would have allowed the jury to convict Jackson of felony murder without intent to kill and of felony murder or premeditated murder as an accomplice under a natural and probable consequences theory.

However, the jury was also instructed on four special circumstances: multiple murder and felony-murder robbery, felony-murder burglary and felony-murder kidnapping. The court instructed the jury, based on CALJIC No. 8.80, that if it found Jackson guilty of first degree murder, it was required to determine whether these special circumstances applied. Each of the three felony-murder special-circumstances instructions required the jury to find: "That the defendant, Maurice A. Jackson, was engaged in and was an accomplice in the commission and attempted commission of and the immediate flight after committing and attempting to commit" the underlying felony ("robbery," "kidnapping" or "burglary"); "That the murder was committed while the [defendants were] engaged in the commission or attempted commission of [that underlying felony]" and "The murder was committed in order to carry out or advance the commission of [that underlying felony] or to facilitate the escape therefrom or to avoid detection." The court further instructed the jury that a felony-murder special circumstance was "not established if the [felony] was merely incidental to the commission of the murder." As to multiple murder, the jury was instructed that the special circumstance required that Jackson "has in this proceeding been convicted of more than one murder in the first or second degree."

As to all four special circumstances, the court instructed the jury that if it found the defendant was either the actual killer, a co-conspirator, or an aider or abettor but was

31

"unable to decide which," then it had to "find beyond a reasonable doubt that the defendant, with intent to kill participated as a co-conspirator with or aided and abetted an actor in commission of the murder in the first degree, in order to find the special circumstance to be true. On the other hand, if you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true."

The jury returned verdicts of "True" on the multiple-murder special circumstance for all three of the murders. It returned verdicts of "True" on the robbery, burglary and kidnapping felony-murder special circumstances for the murders of Castaneda and Treas and "Not True" on the robbery and burglary special circumstances for the murder of Blackmon.

On Jackson's resentencing petition, the trial court determined at the prima facie stage that "as a matter of law [Jackson] is not entitled to relief," for the murders of Castaneda and Treas. Its decision was based on "relevant portions of the record of conviction including: the Information, the jury instructions, the verdict forms, the Abstract of Judgment, and the clerk's minutes." The court also took judicial notice of the factual summary of the case evidence described by this court in the unpublished opinion from Jackson's direct appeal. However, it did not consider the trial evidence or the preliminary hearing transcript as part of the record of conviction in deciding that as a matter of law Jackson was guilty of the Castaneda and Treas murders.

## B. *Claimed Error re Law of the Case*

As we have indicated, based on the jury instructions and the verdicts on the robbery and burglary felony-murder special circumstances, the trial court concluded the jury necessarily found that Jackson either killed Castaneda and Treas or acted with the intent to kill them when he aided and abetted in the commission of robbery and burglary.

32

Either finding, the trial court reasoned, was sufficient to preclude any showing that Jackson could not be convicted of murder under the new law.

Jackson contends this was error for several reasons. First, citing *People v. Harden* (2022) 81 Cal.App.5th 45, 50, he contends it was error for the trial court to rely on law-of-the-case doctrine in denying relief at the prima facie stage, which he contends it "appears" to have done because it cited this court's opinion on his direct appeal holding substantial evidence supported the jury's special circumstances finding that he had an intent to kill. We agree that the appellate opinion on direct appeal is not binding here, for two reasons. First, we agree that Jackson was not precluded from offering additional evidence on the issue of his intent as to the Treas and Castaneda murders, and there was never a commitment by his counsel that he would not do so if the court held the required hearing. And, as pointed out in *Harden*, "[a]t the prima facie stage of a[] [section 1172.6] proceeding, it is of course impossible to know what the evidence will ultimately be at an evidentiary hearing that has not yet occurred." (*Ibid*.) Thus, "prior to a hearing under section [1172.6], subdivision (d)(3), the law-of-the-case doctrine cannot conclusively establish disentitlement." (*Ibid*.)

Second, and more importantly, an amendment the Legislature made to the predecessor to section 1172.6 made clear that "a court determination that substantial evidence supports a homicide conviction is not a basis for denying resentencing after an evidentiary hearing." In *Strong*, the court held that neither "is it a basis for denying a petitioner the opportunity to have an evidentiary hearing in the first place." (*Strong*, *supra*, 13 Cal.5th 698, 720.)

Thus, insofar as it held the opinion on direct appeal "binding on this court for re-sentencing purposes," the trial court erred. But the error was inconsequential because the trial court did not rely on it. Rather, it went on to discuss that because the instructions the jury was given on the special circumstance mirrored the elements of what is now section

33

189(e)(2) that " '[a] participant in the perpetration or attempted perpetration of a felony . . . in which a death occurs is liable for murder only if one of the following is proven: [¶] . . . [¶] [t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.' "  The court's opinion concluded that the jury "necessarily must have found Jackson was either the actual killer or he was a direct aider and abettor of co-defendants Boston and/or Amos [who acted] with the intent to kill i.e., he shared Amos's and Boston's intent to shoot and kill the victims."  The jury's findings on the special circumstances thus demonstrated that Jackson "could be convicted of first degree murder under the new law" and was ineligible for relief "even without consideration of the opinion of the First District Court of Appeal[] in Petitioner's case."  In short, any error in the trial court's application of law of the case to the Treas and Castaneda murders is harmless beyond a reasonable doubt.

## C.  *Claimed Error Regarding Issue Preclusion*

Jackson next argues that the court erred in applying issue preclusion to the jury's true finding on the jury's special circumstance finding because " 'at least one juror' could have found the special circumstances true without necessarily finding [as now required by section 189, subdivision (e)(1) and (e)(2)], that either . . . Mr. Jackson was the actual killer or, with the intent to kill, aided and abetted the actual killer in the commission of murder.  His argument is based on two premises.  First, the jury could have interpreted "actual killer" to mean merely a person who in some way caused the victim's death, rather than " 'someone who personally killed the victim' " as required by recent case law narrowing the definition of "actual killer" to mean only the latter.  Second, the jury could have convicted him of aiding and abetting any actor in committing the robbery or burglary rather than aiding and abetting the actual killer in the killing itself.  We will address each of these contentions in turn.

34

### 1. The claim of error regarding meaning of "actual killer" (§ 189(e)(1))

Jackson first contends that the jury's possible finding that he was the actual killer and therefore did not need to intend to kill is not subject to issue preclusion because the meaning of "actual killer" as used in the special circumstance and incorporated into the felony-murder statute has been narrowed since his conviction in 1991. Jackson cites *People v. Garcia* (2020) 46 Cal.App.5th 123 (*Garcia*); *People v. Vang* (2022) 82 Cal.App.5th 64 (*Vang*); and *People v. Lopez* (2023) 78 Cal.App.5th 1 (*Lopez*), which he describes as "recent case law" that has given a new meaning to "actual killer."

We cannot accept Jackson's premise that the law regarding who may be an "actual killer" has changed significantly since the time of his trial. Indeed, the cases on which he relies undermine his argument. In *Vang*, for example, the court stated, "Since *Tison* [*v. Arizona* (1987) 481 U.S. 137 (*Tison*)], our Supreme Court has repeatedly characterized the case as articulating the constitutional limits on executing felony murderers 'who did not personally kill,' equating the term 'actual killer' with someone who 'personally killed' the victim." (*Vang, supra,* 82 Cal.App.5th at p. 89 [citing, among other cases, *People v. Jennings* (1988) 46 Cal.3d 963, 979 (*Jennings*)]; see also *Lopez, supra*, 78 Cal.App.5th at pp. 16-17; *Garcia, supra*, 46 Cal.App.5th at p. 151 [citing *Jennings* and *People v. Belmontes* (1988) 45 Cal.3d 744 (*Belmontes*), overruled on other grounds in *People v. Cortez* (2016) 63 Cal.4th 101, 118-119, and disapproved of on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22 ].)

The reading of "actual killer" as used in the special circumstance statute, section 190.2, subdivision (c) (formerly 190.2, subd. (b)) to mean a person who "personally killed" the murder victim dates at least as far back as 1982. That was the year the United States Supreme Court held, in *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), that the culpability of a defendant who "did not kill or intend to kill" was "plainly different from

35

that of the robbers who killed" and treating such a defendant the same as the killers by sentencing him to death was impermissible under the Eighth Amendment. (*Enmund,* at pp. 798-801.) In *People v. Anderson* (1987) 43 Cal.3d 1104 (*Anderson*), our high court held that *Enmund* means that the "[t]he court must instruct on intent to kill as an element of the felony-murder special circumstance when there is evidence from which the jury could find [citation] that the defendant was an aider and abettor rather than the actual killer," observing that the evidence showed that defendant either "*actually killed the victims* or was not involved in the crimes at all." (*Anderson,* at pp. 1147-1148, italics added; see *id*. at pp. 1140-1141 [discussing *Enmund*].)

In 1986, the United States Supreme Court explained that the class of persons *Enmund* held could not constitutionally be subjected to the death penalty are those guilty of murder under state law "who *did not themselves kill*, attempt to kill, or intend to kill." (*Cabana v. Bullock* (1986) 474 U.S. 376, 385, overruled in part on other grounds in *Pope v. Illinois* (1987) 481 U.S. 497, 503, fn. 7. italics added; see also *id*. at p. 386 ["If a person sentenced to death *in fact killed*, attempted to kill, or intended to kill, the Eighth Amendment itself is not violated by his or her execution," italics added].)[10] Two years later, our high court rejected the argument that intent to kill was an element of the felony-murder special circumstance for actual killers, observing that in *Bullock*, the U.S. Supreme Court "made clear that felony murderers who *personally killed* may properly be subject to the death penalty in conformance with the Eighth Amendment . . . even where no intent to kill is shown." (*Belmontes*, *supra*, 45 Cal.3d at p. 794, italics added.)

In *Jennings*, our high court held, "A felony-murder special circumstance is established even absent intent to kill, premeditation, or deliberation, if there is proof beyond a reasonable doubt that the defendant *personally killed the victim* in the commission or attempted commission of, and in furtherance of, one of the felonies

enumerated in subdivision (a)(17) of section 190.2." (*Jennings*, *supra*, 46 Cal.3d at p. 979, italics added; see also *People v. Miranda* (1987) 44 Cal.3d 57, 89-90 [court need not instruct on intent to kill unless there is evidence from which jury could find defendant was accomplice rather than actual killer; evidence showed defendant "*actually killed*" victim, italics added, abrogated on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4]; *People v. Sanders* (1990) 51 Cal.3d 471, 518, fn. 20 [there was sufficient evidence "*defendant himself struck the fatal blows and was thus the actual killer,* not a mere aider and abettor," italics added].)

In short, Jackson's argument that jurors would not have understood the reference to the "actual killer" in the special circumstances instruction to mean the person who "personally killed" the victim because the law so stating made that clear only recently is without merit. The recent appellate decisions he cites do not establish a new definition of "actual killer" as used in the special circumstance and now incorporated into the felony-murder statute.[11]

---

[11] In two of the recent cases Jackson cites, the jury had been instructed that to find the robbery-murder special-circumstance allegation true, the jury had to find only that defendant " 'did an act that *caused the death of another person*' " and that an act causes death if it is " 'the direct, natural, and probable consequence of the act' " and " 'would not have happened without the act.' " (*Lopez*, *supra*, 78 Cal.App.5th at p. 16 [quoting former CALCRIM No. 730]; see *Garcia*, *supra*, 46 Cal.App.5th at pp. 150, fn. 29, 155.) In the third, the jury was instructed that what was required for felony murder and for the special circumstance was that "defendant committed a kidnapping; defendant intended to commit the kidnapping; and, while committing the kidnapping, defendant caused his wife's death." (*Vang*, *supra*, 82 Cal.App.5th at p. 69.) Here, the special circumstance instruction did not articulate any such theory; it told the jury that if it concluded defendant was the actual killer, a co-conspirator or an aider and abettor but was "unable to decide which," then it had to "find beyond a reasonable doubt that the defendant, with the intent to kill, participated as a co-conspirator with, or aided and abetted an actor in commission of the murder in the first degree, in order to find the special circumstance to be true." It was further instructed that if it found "beyond a reasonable doubt that the defendant was *the actual killer*, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true." (Italics added.)

Jackson argues jurors may have improperly relied on proximate causation in finding him the actual killer. He does not contend there was any instruction suggesting proximate causation was dispositive in determining whether the defendant was the actual killer. Instead, he points to an isolated reference by the prosecutor in closing argument referring to the "actual killer" as "the person who does the act that proximately results in the death of a named victim" and argues this description constituted misconduct. " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337.) We consider the remark "[i]n the context of the whole argument and the instructions." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)

Here, the prosecutor referred to "*the* person who does *the* act that proximately results in the death of a named victim" (italics added), suggesting there was only one "actual killer." His single reference to "proximately results" was an isolated one; he did not repeat or elaborate on it during his lengthy (102-page) closing. Defense counsel neither objected nor referred to it in her closing argument.

Moreover, although the instructions did not define "actual killer," they clearly distinguished between "[t]hose who directly and actively commit, or attempt to commit the act constituting the crime" and "[t]hose who aid and abet the commission or attempted commission of the crime." The jury would have interpreted "actual killer" in light of that distinction. The court also instructed the jury that it had to accept and follow the law as the court stated it and that if the attorneys said anything in their arguments that conflicted with the court's instructions the jury "must follow my instructions." The jury

38

asked only two questions, neither of which had any bearing on or suggested any doubt about the meaning of "actual killer."

Considering the remark "[i]n the context of the whole argument and the instructions" (*People v. Marshall, supra,* 13 Cal.4th at p. 831) we conclude there was no " 'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Seumanu, supra,* 61 Cal.4th at p. 1337.)

## 2. The claim of error regarding the meaning of aiding and abetting actual killer in committing first degree murder (§ 189(e)(2))

Jackson's second contention, as we have said, is that the jury could have convicted him of aiding and abetting the robbery or burglary rather than aiding and abetting the killing itself, which he contends no longer suffices for an accomplice to be guilty of first degree felony murder. Jackson contends Senate Bill 1437 added both a new mens rea element *and* a new actus reus element, elevating the latter to require aiding and abetting the killing rather than just aiding and abetting the underlying felonies. The People's position is that, for non-killers, Senate Bill 1437 added only the new mens rea element of intent to kill, which appears to be how the trial court interpreted it.[12]

Noting that the trial court discussed only the intent to kill requirement of section 189, subdivision (e)(2), Jackson cites *People v. Curiel,* in which our high court held that dismissal of a section 1172.6 petition at the prima facie stage requires that the record of

---

[12] The trial court did not address as part of its prima facie ruling on the Treas and Castaneda murders the meaning of the alternative method of proving felony murder under the amended section 189(e)(3), which imposes liability upon proof of a defendant's major participation in the underlying felony and acting with reckless indifference to human life. The provision of the special circumstance statute on which section 189, subdivision (e)(3) was based, section 190.2, subdivision (d), was not in effect until June 1990 (see initiative, Primary Elec. (June 5, 1990) Prop 115, § 10, adopted by California voters, eff. June 6, 1990), after the crimes Jackson was charged with were committed, and therefore Jackson was not charged with, and the jury was not instructed on, the major participant/reckless indifference variant of the felony-murder special circumstance.

conviction show the jury made findings on all the elements necessary to convict someone of murder or attempted murder under current law. (See *Curiel*, *supra,* 15 Cal. 5th 433, 447-448, 461-464.) "This requires proof the jury found the defendant harbored the necessary intent *and* he *committed the necessary act or acts* to be guilty under a presently valid theory." (*People v. Kelly* (2024) 105 Cal.App.5th 162, 170 (*Kelly*), second italics added, review granted Nov. 26, 2024, S287341.) Jackson argues the jury's true special circumstance findings "do not establish that that jury found [him] guilty of the Castaneda and Treas murders under a currently valid theory of murder" because the instructions allowed the jury to find him guilty of first degree murder if it found he conspired to commit or participated in the commission of burglary or robbery against Castaneda and Treas with intent to kill, but did not actually kill them or aid and abet in their murders.

To decide whether the trial court's prima facie stage denial of Jackson's petition for resentencing on the Castaneda and Treas murders was erroneous, we must determine whether the trial court's holding that the jury's intent-to-kill finding under the special circumstance instruction it was given is a sufficient basis upon which to conclude as a matter of law that Jackson is ineligible for such relief. This depends first, on whether the amendment to section 189(e)(2) of the felony-murder statute changed the requirements for felony murder by a non-killer to include not only the mens rea of intent to kill but also aiding and abetting *the* killing, and second, if so, whether reasonable jurors could have interpreted the special circumstance instruction they were given to mean that Jackson was only required to have aided and abetted in the underlying felonies.

a. *The parties' arguments*

Jackson focuses on the language of section 189(e)(2), which requires a defendant, acting with intent to kill, to aid, abet, counsel, command, induce, solicit, request, or assist *the actual killer* in the commission of murder in the first degree. Jackson argues that this phrase must be interpreted to mean the defendant aided and abetted the killing itself.

Jackson contends this is different from what the special circumstance required at the time of his trial. The jury at his 1991 trial was instructed that to find the felony-murder special circumstance true for a person not found to be the actual killer, it had to "find beyond a reasonable doubt that the defendant, with intent to kill, participated as a co-conspirator with, or aided and abetted *an actor* in commission of the murder in the first degree." (Italics added.) Relying on *People v. Ervin* (2021) 72 Cal.App.5th 90 (*Ervin*), Jackson contends the jury could have "misinterpreted the instruction to apply to aiding and abetting another in the commission of the robbery or burglary rather than to aiding and abetting the actual killer with the intent to kill" because the jury was not told the defendant had to aid and abet the individual who " 'personally committed the homicidal act.' "

The People's brief was ambiguous as to whether the People agreed with Jackson's interpretation of section 189(e)(2) to require accomplices to aid and abet the killing itself. The People initially conceded that the court erred in denying resentencing as to the Treas and Castaneda murders at the prima facie stage because "the jury's true findings on the special circumstance allegations do not reflect all the factual findings necessary to support a murder conviction under current law." The People acknowledged that the special circumstance instruction given at Jackson's trial included the intent to kill requirement. But they posited this was insufficient to dismiss at the prima facie stage because "[Senate Bill] 1437's change to section 188, subdivision (a)(3) 'did not simply "add the element of malice aforethought" to existing theories of liability. [Citation.] It eliminated the doctrine of natural and probable consequences in its entirety . . . .' " Under the conspiracy instructions the jury was given, it "could have found appellant guilty of first degree murder if it found he 'participated as a co-conspirator with' Boston and/or Amos to commit burglary or robbery against Castaneda and Treas with the intent to kill, but did not actually kill them or aid and abet in their murders." But the People's

41

brief failed to address whether the special circumstance instructions and verdicts demonstrate the actus reus requirement for *felony murder* under section 189(e)(2), leaving unclear whether the People agreed with Jackson's interpretation of that subdivision. In light of this ambiguity, we asked the parties to provide supplemental briefing on the meaning of section 189(e)(2), including by discussing recent case law addressing that subject and pertinent legislative history.

In their supplemental brief, the People disagree with Jackson's argument that "after the passage of [Senate Bill] 1437, the special circumstance findings do not conclusively establish that he was guilty of first degree murder." Citing the recent caselaw we asked the parties to address, the People adopt the view of three of the five appellate decisions addressing the issue, positing "[t]hose cases correctly conclude" that section 189(e)(2) requires only that the defendant aid and abet the underlying felony. Jackson relies on the two decisions reaching the opposite result and the dissents in two of the contrary majority decisions.

b. *The law that governed at the time of Jackson's trial*

At the time of Jackson's offenses, section 189 provided in relevant part, "All murder which . . . is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under [certain other penal code provisions] . . . is murder of the first degree . . . ." (Stats. 1982, ch. 949, § 1, p. 3438, § 1, eff. Sept. 13, 1982.) The mental state required was simply the specific intent to commit the underlying felony; neither intent to kill nor malice aforethought was required. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140-1141 [and cases cited therein]; see *People v. Pulido* (1997) 15 Cal.4th 713, 716 ["Penal Code section 189 provides that any killing committed in the perpetration of specified felonies, including robbery, is first degree murder. Under long-established rules of criminal complicity, liability for such a murder extends to all persons 'jointly engaged at the time of such

42

killing in the perpetration of or an attempt to perpetrate the crime of robbery' [citation] 'when one of them kills while acting in furtherance of the common design,' " fn. omitted].)

As to the felony-murder special circumstance, the initiative statute in effect at the time provided that the penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for a term of life without the possibility of parole" in specified circumstances, one of which was that "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing or attempting to commit" any of nine specified felonies (including robbery and burglary). (Stats. 1989, ch. 1165, § 16 [amending § 190.2; see *id.,* subd. (a)(17).) Subdivision (b) of section 190.2 provided, "Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in [various paragraphs, including (a)(17)]." (Stats. 1989, ch. 1165, § 16 [amending section 190.2; see *id.,* subds. (a)(17) and (b)]; Prop. 7, § 6, subds. (a)(17), (b), as approved by voters, Gen Elec. (Nov. 7,1978).)

In 1983, the California Supreme Court in *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 140 (*Carlos*), overruled in part in *Anderson*, *supra,* 43 Cal.3d 1104, observed that section 190.2, subdivision (a)(17), omitted "any express requirement of intentionality," which suggested "that the circumstance applies to a defendant whether or not he intended to kill." (*Carlos*, at p. 140.) However, finding anomalies and ambiguities created by the absence of an intent requirement for the listed felonies (*id*. at pp. 139-143), considering the legislative history and purpose of the statute (*id*. at pp. 143-

43

145) and applying the doctrines of construing penal statutes to resolve reasonable doubts in favor of defendants (*id*. at pp. 145-147) and generally to avoid constitutional concerns (*id*. at pp. 147-153), the court interpreted section 190.2, subdivision (b) of the statute to impose a requirement of intent to kill for the felony-murder special circumstance for both the actual killer and his or her accomplices. (*Carlos,* at pp. 153-154.) With respect to accomplices, *Carlos* held "the requirement that the accomplice 'intentionally' aid in the commission of a murder is inherently ambiguous when applied to a felony murder, for it could mean either that the accomplice must intentionally aid in a killing, or that he need only intentionally aid the commission of the underlying felony." (*Id*. at p. 142.) The court viewed the legislative history as resolving that question. (See *id*. at pp. 144-145 [initiative proponents' rebuttal argument that " 'the person must have intentionally aided in the commission of a murder to be subject to the death penalty under this initiative' " indicated "an intent which they emphatically communicated to the voters—that an accomplice would face the death penalty only if he intentionally aided a killing"].)

Four years later, in *Anderson,* the court reversed the part of its prior ruling in *Carlos* that interpreted the felony-murder special-circumstance statute to require intent to kill for the actual killer. (*Anderson*, *supra,* 43 Cal.3d at pp. 1138-1148.) The court explained that in light of later federal constitutional developments, its constitutional concern about imposing the death penalty without requiring intent to kill was misplaced *with regard to the actual killer* (*id*. at pp. 1138-1141) and concluded that "section 190.2[, subdivision] (b) must be read to govern the liability of the aider and abetter only in light of its broader statutory context." (*Id.* at p. 1142.) Contrary to *Carlos*'s view that the statutory requirement that the aider and abettor intentionally aid in the murder is inherently ambiguous when applied to felony murder, *Anderson* concluded the requirement "is not ambiguous: the aider and abetter must intentionally aid *in a killing*." (*Id*. at p. 1145.) *Anderson* determined that "given a fair reading, section 190.2[,

44

subdivision] (a)(17) provides that intent is not an element of the felony-murder special circumstance" (*id*. at p. 1143), and "does nothing more than declare that both the perpetrator of the underlying felony and his aider and abetter are felony murderers," but section 190.2, subdivision (b) "then declares that the felony-murder aider and abetter is eligible for the death penalty if intent to kill is proved." (*Id.* at pp. 1144-1145.) Thus, the special circumstance "can realistically be read only to require intent to kill for the aider and abetter but not for the actual killer." (*Id.* at p. 1145.)

The following year, the court addressed a claim of instructional error concerning the felony-murder and a multiple-murder special circumstance. (*People v. Warren* (1988) 45 Cal.3d 471 (*Warren*)). The jury had been instructed that to find the multiple-murder or the felony-murder special circumstance true, it had to be proved, " 'That the defendant was either the actual killer or a person who *intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of murder in the first degree.*' " (*Id*. at p. 486, italics added.) The court addressed the possibility that the quoted instruction "might conceivably be understood to mean that a special-circumstance finding could be made as to an aider and abetter if he acted merely with the intent to commit robbery and not with the intent to kill." (*Id.* at pp. 487-488.) In analyzing that issue, the court agreed with the defendant that "before the trier of fact can make a felony-murder or multiple-murder special-circumstance finding as to a defendant who was an aider and abetter rather than the actual killer, it must determine that he acted with intent to kill." (*Id.* at p. 487.) However, it held that a "reasonable juror would understand the language of the instructions to declare that very rule: 'the defendant was . . . a person who intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of murder in the first degree.' Therefore, the instructions, so understood, state the law correctly." (*Ibid*.)

45

The statutes and the case law indicate the law at the time of Jackson's crimes and his trial was that felony murder itself required only intent to commit the underlying felony, participation in the felony and the occurrence of a death during and in furtherance of the felony, but the felony-murder special circumstance required more. To find a defendant guilty of the special circumstance he had either to commit the killing himself or, if he was not the actual killer, to act with the intent to kill and aid and abet the killing.

c. *Current Law: Senate Bill 1437*

**1. *Statutory interpretation***

" 'Our primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent.' (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037 (*Tuolumne Jobs*).) ' " 'When interpreting statutes, we begin with the plain, commonsense meaning of the language used by the Legislature. [Citation.] If the language is unambiguous, the plain meaning controls.' " ' (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 630.) 'To the extent statutory language is ambiguous or open to more than one reasonable interpretation, we may turn to legislative history for guidance.' (*Tuolumne Jobs,* at p. 1040.) Other ' " ' "extrinsic aids" ' " ' to the interpretation of a statute, available when the language is ' " 'unclear or ambiguous,' " ' are ' " ' "the ostensible objects to be achieved, the evils to be remedied, . . . public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " ' (*People v. Scott* (2014) 58 Cal.4th 1415, 1421.) ' " 'Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute.' " ' " (*Newark Unified School Dist. v. Superior Court* (2015) 245 Cal.App.4th 887, 898-899.) " 'Where . . . no single textually determined construction presents itself, we are well

46

advised not to stop with the most plausible reading but to consult other interpretive aids, including legislative history and the context of the enactment.' " (*Newark Unified,* at p. 899.)

### A.    Plain meaning

The statutory language we must interpret is the italicized clause of section 189 (e)(2):  "The person was not the actual killer, but, *with the intent to kill*, *aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree*."  (Italics added.)

We start with the term "murder," the commonsense meaning of which is an unlawful killing.  (See Merriam-Webster Online Dict. <http//merriam-webster.com/dictionary/murder> [as of Mar. 27, 2025] [n. "the crime of unlawfully and unjustifiably killing someone"; v. "to kill (a person) unlawfully and unjustifiably with premeditated malice"]; American Heritage Online Dict. <http//ahdictionary.com/word/search.html?q=murder> [as of Mar. 27, 2025] [n. **a.** "The killing of another person without justification or excuse, especially the crime of killing a person with malice aforethought or with recklessness manifesting extreme indifference to the value of human life."  **b.** "An instance of such killing"; v. 1.  "To kill (another human) in an act of murder."  2. "To kill brutally or inhumanly"].)  While another dictionary definition describes specific forms of murder under law even its definition refers, first and foremost, to "the killing of another human being."[13]  Common synonyms for murder are "homicide" "slaying" "killing" "slaughter" "massacre" and "execution."  (E.g., Merriam-

---

[13]  E.g., Dict.com  <http//dictionary.com/browse/murder> [as of Mar. 27, 2025] (n. "*Law. the killing of another human* being under conditions specifically covered in law. In the U.S., special statutory definitions include murder committed with malice aforethought, characterized by deliberation or premeditation or occurring during the commission of another serious crime, as robbery or arson first-degree murder, or murder one, and murder by intent but without deliberation or premeditation second-degree murder, or murder two."  v. "*Law.* to kill by an act constituting murder," italics added.)

Webster Online Thesaurus <https://www.merriam-webster.com/thesaurus/murder> [as of Mar. 27, 2025]; Roget's 21st Century Thesaurus (3d ed. 2005) p. 559.)  This commonsense meaning of murder fits within this state's legal definition.  (See § 187, subd. (a) [defining murder as "the unlawful killing of a human being, or a fetus, with malice aforethought"].)

These definitions and synonyms are of murder writ large as opposed to "murder in the first degree."  If there is a commonsense (as opposed to a technical legal) meaning of "murder in the first degree," it necessarily entails the killing of a human being.  It follows that the *commonsense* meaning of the phrase "aided, abetted, counseled, commanded, induced, solicited, requested, or assisted . . . in the *commission of murder* in the first degree" is aiding, abetting, . . . or assisting a *killing* that legally constitutes first degree murder.  When the words "actual killer" are included in the phrase, so that it reads, "aided, abetted . . . or assisted the *actual killer* in the *commission of murder* in the first degree," the ordinary meaning of the statutory language is inescapable:  assisting the killer in killing.  The phrase does not plainly express, at least in commonsense terms, the idea of aiding, abetting, or assisting someone in commission of a robbery, burglary or other felony by an act that does not also directly assist in a killing.  (See *Warren*, *supra*, 45 Cal.3d at pp. 487-488; see also *People v. Morris* (2024) 100 Cal.App.5th 1016, 1031 (*Morris*), review granted July 17, 2024, S284751, (dis. opn. of Moore, J.) [plain meaning of section 189(e)(2) is that People must prove non-killer participant in underlying felony who acted with intent to kill aided, abetted, . . . or assisted the actual killer in the commission of first degree murder, not merely that he was engaged in committing underlying felonies with the killer].)

Reading the language in the context of other provisions in the statute reinforces our interpretation.  (See *Lewis*, *supra*, 11 Cal.5th 952, 961 [in interpreting statute, we look to its entire substance and construe words in context, keeping in mind nature and

purpose of statute].)  There are two references in section 189, subdivision (e) to involvement in an underlying felony.  First, subdivision (e) begins, "*A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a)* in which a death occurs is liable for murder only if one of the following is proven: . . . ."  (Italics added.)  Second, subdivision (e)(3), the third of the three circumstances that follow the introductory language, provides, "*The person was a major participant in the underlying felony* and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  (Italics added.)  These two provisions within subdivision (e), the entirety of which, as we will discuss, was added to section 189 in Senate Bill 1437, show the Legislature knew how to express in unmistakable terms the act of participating in an underlying felony.  Given the very different language it used in subdivision (e)(2)— "*aided, abetted, . . .or assisted the actual killer in the commission of murder in the first degree*"—the Legislature plainly meant something different from aiding or otherwise participating in the felony.  Looking at section 189, subdivision (e) in its entirety, "it is clear the Legislature intended to draw a distinction between assisting first degree murder and assisting the underlying felony." (*Kelly, supra,* 105 Cal.App. 5th at p. 172.) "Indeed, the law is well established that when 'the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning.' " (*Ibid*., quoting *People v. Trevino* (2001) 26 Cal.4th 237, 242.)

In *Kelly*, Justice Bedsworth made a further point about the structure of section 189, subdivision (e) that reinforces this interpretation.  Again, the opening clause states, "A participant in the perpetration or attempted perpetration of a felony listed in [section 189,] subdivision (a) in which a death occurs *is liable for murder only if one of the following is proven: . . .*"  What follows, of course, are the three alternative routes to felony murder liability, including section 189(e)(2).  The wording of the opening clause

49

"indicates . . . that *something more* is spelled out" in (e)(1), (e)(2) and (e)(3) than acting as a "participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs." (*Kelly, supra,* 105 Cal.App.4th at p. 173.)

Of course, intent to kill is something more, and that is a part of section 189(e)(2). But if that were all, the Legislature would only have needed to say, "The person was not the actual killer but [acted] with the intent to kill." That language would have sufficed if the something more was only the addition of the mens rea, intent to kill, without any heightened actus reus. The Legislature did not stop with the mens rea, however, but articulated an actus reus—"*aided, abetted . . . or assisted the actual killer in the commission of murder in the first degree.*" "Just as the first portion of section 189(e)(2) raises the intent (mens rea) requirement for participants in section 189[, subdivision] (a) felony murder, the italicized portion heightens the act (actus reus) requirement." (*People v. Lopez* (2023) 88 Cal.App.5th 566, 581 (*Lopez I*) (dis. opn. of Raphael, J.).) If we instead interpreted the italicized language to mean simply participating in commission of the listed felony, it would be redundant with the prefatory clause, effectively "render[ing] meaningless the entire 21-word actus reus requirement in section 189(e)(2)." (*Id.* at p. 585.) "The Legislature 'does not engage in idle acts, and no part of its enactments should be rendered surplusage if a construction is available that avoids doing so.' " (*Ibid.*) Stated otherwise, "[t]o avoid redundancy, [the actus reus language] must mean assisting the killer in the commission of the murderous act itself, not just the underlying felony." (*Kelly*, *supra*, 105 Cal.App.5th at p. 173.)[14]

---

[14] As Justice Raphael pointed out in his dissent in *Lopez I*, "The other § 189(e) categories address actus reus too. The first prong addresses actus reus only: the killer during a robbery is liable for first degree murder even if the killing [was] accidental. (§ 189(e)(1).) The third prong addresses actus reus in requiring that the defendant act as a 'major participant' in a listed felony along with having the mens rea of 'reckless indifference to human life.' The Legislature in Senate Bill 1437 was concerned with intent *and* actions." (*Lopez I*, *supra,* 88 Cal.App.5th at p. 586 (dis. opn. of Raphael, J.).)

Prior to *Kelly*, the first published decision to address the meaning of the felony-murder provisions adopted in Senate Bill 1437 was *Ervin, supra,* 72 Cal.App.5th 90.  In that case, Justice Moore, joined by Justice Fybel and by Judge Marks, addressed an appeal from a decision denying resentencing under section 1170.95 (later renumbered as 1172.6) in a case tried on both felony-murder and premeditated-murder theories.  (*Ervin,* at pp. 102, 103.)  The jury had rejected the personal firearm use enhancement, as a result of which it appeared to have rejected the prosecution's theory that he was the actual killer.  (*Id*. at p. 104.)  The People urged the court to affirm the trial court's denial of resentencing at the prima facie stage, arguing "the jury's true findings on the felony-murder special-circumstance allegations categorically preclude[d] Ervin from obtaining relief under section 1170.95 as a matter of law." (*Ibid*.)  In rejecting that argument, the court observed the difference in language between the special circumstance and the current first degree felony-murder rule under section 189 and concluded that "it is possible the jurors misinterpreted the 1993 instruction to mean they could find the felony-murder special-circumstance allegation true if they generally found Ervin aided and abetted *another* in the commission of the robbery or burglary (that ultimately led to the killing of a human being), rather than a more specific finding that Ervin aided and abetted 'the actual killer . . . with the intent to kill.'  (See § 189, subd. (e)(2).)" (*Ervin*, at pp. 108-109.)

In contrast to *Kelly* and *Ervin*, three majority opinions—also from the Fourth District—interpreted this same statutory language to refer to aiding and abetting the actual killer not in the killing but only in the underlying felony.  (See *People v. Lopez* (2024) 104 Cal.App.5th 616, 621 (*Lopez II*), review granted Nov. 13, 2024, S287162; *Morris*, *supra*, 100 Cal.App.5th at pp. 1025-1029, review granted July 17, 2024, S284751; *Lopez I*, *supra,* 88 Cal.App.5th at pp. 577-579.)  Two of these opinions were issued over dissents.  (*Lopez I*, at p. 580 (dis. opn. of Raphael, J.); *Morris,* at p. 1030 (dis.

51

opn. of Moore, J.); see also *Kelly*, *supra*, 105 Cal.App.5th at p. 177 (dis. opn. of Gooding, J.)).

The majority opinions in *Lopez I*, *Lopez II* and *Morris* relied in large part on *People v. Dickey* (2005) 35 Cal.4th 884, 900-901 (*Dickey*), which 20 years ago reinterpreted the special circumstances language that the Court on three prior occasions (in *Carlos*, *Anderson* and *Warren*) had interpreted to require aiding and abetting in the killing. In *Dickey*, the court rejected its prior interpretations and held the language in former section 190.2, subdivision (b) [later renumbered as subdivision (c)]—"Every person . . . found guilty of intentionally aiding, abetting . . . or assisting any actor in the commission of murder in the first degree . . ."—meant simply aiding and abetting in the underlying felonies and not in the killing. (*Dickey,* at pp. 900-901, italics omitted [discussed in *Lopez I, supra*, 88 Cal.App.5th at pp. 577-578; *Morris*, *supra*, 100 Cal.App.5th at pp. 1026-1027; *Lopez II, supra*, 104 Cal.App.5th at pp. 621-623].)

There are several reasons we do not agree that the Supreme Court's 2005 interpretation of the special circumstance statute governs the interpretation of current section 189(e)(2).

First, the *Morris* court asserted that the language *Dickey* interpreted was "nearly identical" to the language in section 189(e)(2) (*Morris*, *supra*, 100 Cal.App.5th at p. 1026), but in our view the assertion is both incomplete and inaccurate. The Legislature did not incorporate the language of section 190.2, subdivision (b) wholesale into section 189(e)(2). It changed the language in significant respects. Former section 190.2, subdivision (b) stated, "*Every person whether or not the actual killer* found guilty of *intentionally* aiding, abetting . . . or assisting *any actor* in the commission of murder in the first degree" (italics added) would be subject to a sentence of life without parole or death in any case in which one or more special circumstance was found true. (Former § 190.2, subd. (b), added by initiative measure Prop. 7, §6, approved by the electorate Nov.

52

7, 1978.)  Section 189(e)(2), by contrast, states, "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder *only if one of the following is proven*: . . . [¶] (2) *The person was not the actual killer*, but, *with the intent to kill*, aided, abetted, . . . or assisted *the actual killer* in the commission of murder in the first degree."  (Italics added.)  The special circumstance language in section 190.2, subdivision (c) begins expansively ("Every person . . ."), whereas the language of section 189, subdivision (e) is restrictive and limiting ("only if one of the following is proven . . .").  Further, the special circumstance refers to "aid[ing], abet[ting], . . . or assist[ing] *any actor*" (§ 190.2, subd. (c)), which makes sense if, as *Dickey* held, the defendant simply had to aid in the commission of the underlying felony.  Section 189(e)(2), on the other hand, limits what constitutes first degree felony murder to, among others, those who "aided, abetted, . . . or assisted the *actual killer*."  (Italics added.)  If all a defendant were required to do was aid and abet the underlying felony, there would be no logical reason to limit the person he aided to the actual killer.  Similarly, "*intentionally aiding . . . any actor*" in committing first degree murder is far less clear and not the same as, "with *intent to kill*, aided "*the actual killer*" in committing first degree murder.  We agree with Justice Bedsworth that the Legislature's different word choices were intended to narrow felony murder by requiring a "closer nexus between the defendant's actions and the actual killing than was previously required [for the special circumstance] under *Dickey*."  (*Kelly*, *supra*, 105 Cal.App.5th at p. 174.)

Even if the language in sections 189 and 190.2 were not significantly different, "[t]he statutory construction rule . . . , that identical statutory language should be interpreted in the same way, applies only when the statutes in question cover 'the same or an analogous subject' matter."  (*Kibler v. Northern Inyo County Local Hosp. Dist*. (2006) 39 Cal.4th 192, 201.)  Where, as here, two statutes " 'serve quite different purposes,' " the rule does not apply.  (*Century 21 Chamberlain & Associates v. Haberman* (2009)

53

173 Cal.App.4th 1, 10; see also *Benun v. Superior Court* (2004) 123 Cal.App.4th 113, 120-121.) " '[E]stablishing terminological uniformity throughout our codified law is less important than discerning " 'the intent of the Legislature so as to effectuate the purpose' " of each individual statute.' " (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 782-783.) The purposes of the initiative measure that enacted the current special circumstance statute were to increase punishment for murder crimes—to "increase the penalties for first and second degree murder," "expand the list of special circumstances requiring a sentence of either death or life imprisonment without the possibility of parole" and "revise existing law relating to mitigating or aggravating circumstances" to make the death sentence mandatory if aggravating circumstances outweigh mitigating circumstances. (Murder. Penalty California Proposition 7 (1978) <https://repository.uclawsf.edu/cgi/viewcontent.cgi?article=1839&context=ca_ballot_props> [as of Mar. 27, 2025] [Ballot Pamp. Gen. Elec. (Nov. 7, 1978) Analysis by Legislative Analyst of Prop. 7, p. 32].) As we discuss below, the purposes of Senate Bill 1437 were quite the opposite: to ameliorate the harshness of the murder statutes by eliminating natural and probable consequences theories of murder and significantly limiting the felony murder law. Thus, under the cases just cited, the rule of construction that the same language in different statutes is construed the same way does not apply where one statute is punitive and the other ameliorative.

There is another reason *Dickey* does not answer the question before us. In *Dickey*, the court flatly rejected the defendant's argument that the felony-murder special circumstance required the People to prove "not only that [the defendant] aided or abetted the burglaries and robberies, but also that he 'assisted in the killings themselves.' " (*Dickey, supra,* 35 Cal.4th at pp. 900-903.) Its analysis was this: "Section 190.2, former subdivision (b) is not helpful to defendant because, under the felony-murder doctrine, he *was* found guilty of aiding or abetting first degree murders. All persons aiding or

54

abetting the commission of burglary or robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design." (*Id.* at p. 900.) But as Justice Raphael observed in *Lopez I,* that is no longer the case. As we shall discuss, the purpose of Senate Bill 1437 was to limit felony-murder liability, including first degree felony-murder liability: While section 189, subdivision (a) states, as it did before Senate Bill 1437, that "[a]ll murder . . . that is committed in the perpetration of, or attempt to perpetrate" any of 15 specified felonies "is murder of the first degree," subdivision (e) narrows the felony-murder rule significantly by limiting it to the actual killer and to accomplices who either intend to kill and aid in the murder or play a major role in the underlying felony and act with reckless indifference to human life. Thus, "*Dickey*'s premise is the very one that the Legislature abrogated in Senate Bill No. 1437. Now, when a jury applies section 189(e)(2) to decide whether a defendant assisted 'the actual killer in the commission of murder,' the defendant has not yet been found guilty of murder. It is no longer true that all persons who aided in a burglary or robbery are guilty of murder when one of them kills during that offense. Whether such a participant is liable for murder is what the jury is now charged with deciding when it applies section 189[, subdivision] (e). For this reason, it does not make sense to view the actus reus language in section 189(e)(2) as a 'term of art' (maj. opn., *ante*, at p. 578) that the Legislature has grafted from the special circumstance with *Dickey*'s construction of its meaning. Doing so renders meaningless the 21-word actus reus requirement in section 189(e)(2), as, so construed, it provides no restriction on murder liability; one must have aided the underlying felony simply to participate in traditional felony murder." (*Lopez I, supra,* 88 Cal.App.5th at p. 587 (dis. opn. of Raphael, J.).)

Finally, we do not agree with the *Lopez I* and *Morris* majorities' argument that the "[t]he *whole purpose* of Senate Bill 1437 was to stop the practice of imputing malice to defendants to justify convicting them of murder" and thus "there is no reason to interpret

55

the actus reus requirement as anything different than what the felony-murder actus reus requirement was before Senate Bill 1437—'aiding and abetting the underlying felony or attempted felony that results in the murder.' " (*Lopez I*, *supra*, 88 Cal.App.5th at p. at p. 578, italics added; see *Morris*, *supra*, 100 Cal.App.5th at p. 1027.) Ending the practice of imputing malice certainly was a major purpose of the legislation and underlies the elimination of natural and probable consequences murder and, in part, the reform of felony-murder law. As we will discuss further, however, the legislative findings and legislative history documents reflect that as regards felony murder, the bill had broader purposes, including the "need for statutory changes to more equitably sentence offenders in accordance with their *involvement* in homicides" and to base liability for murder on the "person's own *actions and* subjective mens rea." (Legis. Counsel's Dig., Sen. Bill 1437, ch. 1015 (2017-2018 Reg. Sess.) Oct. 1, 2018, p. 2, italics added; see Semuteh Freeman, San Francisco Public Defender's Office, letter to Senator Nancy Skinner, Apr. 16, 2018.) The Legislature sought to make the felony murder rule more equitable by limiting liability to situations where a defendant's intent *and actions* warrant it.

## B. Legislative History

In light of the split of authority on the meaning of section 189(e)(2), we cannot deny that the interpretation adopted by the court in *Lopez II* and by the majorities in *Morris* and *Lopez I* is *plausible*. Although we find the interpretation adopted in *Kelly* and *Ervin* and the dissenting opinions in *Lopez I* and *Morris more* plausible, where there are two or more plausible interpretations, we are " 'well advised not to stop with the most plausible reading but to consult other interpretive aids, including legislative history and the context of the enactment' " and " ' " '[u]ltimately [to] choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to

promoting rather than defeating the general purpose of the statute.' " ' " (*Newark Unified*, *supra,* 245 Cal.App.4th at p. 899.)

i.      Legislative purpose

The origin of felony murder in this state has been traced to a statute adopted by the California Legislature at its initial session, on April 16, 1850. (*People v. Dillon* (1983) 34 Cal.3d 441, 465-472.) But as the court observed in *Dillon*, the rule has long been criticized, including by the court itself. (*Id*. at p. 463 ["And we have recognized that the rule is much censured 'because it anachronistically resurrects from a bygone age a "barbaric" concept that has been discarded in the place of its origin' [citation] and because 'in almost all cases in which it is applied it is unnecessary' and 'it erodes the relation between criminal liability and moral culpability.' "]; see also *id*. at p. 472, fn. 19.) Criticism notwithstanding, the court concluded that in California "the first degree felony-murder rule is a creature of statute" that it lacked the power to "judicially abrogate . . . merely because it is unwise or outdated." (*Id*. at p. 463.) In a footnote, the court invited "[a] thorough legislative consideration of the whole subject." (*Id*. at p. 463, fn. 19.)

The California Legislature finally took up the mantle in 2017. Reciting the "bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability," the Senate proclaimed that further reform to the murder statutes was necessary "to limit convictions and subsequent sentencing in both felony murder cases and aider and abettor matters prosecuted under 'natural and probable consequences' doctrine so that the law of California fairly addresses the culpability of the individual and assists in the reduction of prison overcrowding, which partially results from lengthy sentences which are not commensurate with the culpability of the defendant." (Sen. Conc. Res. No. 48—Relative to criminal sentencing, (2017-2018 Reg. Sess.) Res. Ch. 175, p. 1, filed with Secretary of

57

State, Sept. 22, 2017.)  The resolution expressed concern about the criminal liability of defendants prosecuted under the felony murder and natural and probable consequences doctrines, noting that under the former a defendant can be convicted of first degree murder "even if the killing was unintentional, accidental, or negligent" (*id*. at p. 2); that while some other jurisdictions had abrogated or abolished the felony-murder rule through legislation or case law, in California, those who commit a felony "are not sentenced according to their individual level of culpability" (*id.* at p. 3); and that "[d]efendants charged and convicted under felony murder are subject to the same sentencing as the actual perpetrator of the murder, even if their actual involvement was limited to a lesser crime." (*Ibid*.)  The Legislature concluded by expressly recognizing "the need for statutory changes to more equitably sentence offenders in accordance with their involvement in the crime." (*Id*. at pp. 4-5.)

The following year, Senators Skinner and Anderson proposed legislation addressing these concerns and sought to reform California's murder statutes through Senate Bill 1437 in two major respects.  As explained by our colleagues in the Third District, the bill "amended the mens rea requirement for murder" by "requiring proof of malice except in cases of felony murder," thereby "eliminat[ing] aiding and abetting murder liability under a natural and probable consequences theory." (*Vang*, *supra*, 82 Cal.App.5th 64, 83.)  It "also amended section 189, by adding a new subdivision (e), relating to the felony-murder rule," limiting first degree felony murder liability to three circumstances:  "a participant in the perpetration of a qualifying felony is liable for felony murder only if the person:  (1) actually killed the victim; (2) aided, assisted, or induced the murder with the intent to kill; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of section 190.2." (*Ibid*.)

58

The purpose of the legislation was broadly ameliorative:  "to limit convictions and subsequent sentencing so that the law of California fairly addresses the culpability of the individual and assists in the reduction of prison overcrowding, which partially results from lengthy sentences that are not commensurate with the culpability of the individual."  (Sen. Bill 1437, § 1, subd. (e) [uncodified findings and declarations].)

The reform was directed at both the intent and acts required to convict a person of felony murder.  The legislative history documents contain such statements as:

"S.B. 1437 simply reduces the unfairness of the felony murder rule by refocusing attention on the *intent and actions* of the participants."  (Sen. Com. on Public Safety, Analysis of Sen. Bill 1437, as introduced February 16, 2018, p. 9 (Hearing date Apr. 24, 2018), italics added.)

"[A]llowing conviction for murder *without the requisite action or intent* is unfair to adults and juveniles alike . . . ."  (Sue Burrell, Pacific Juvenile Defender Center, letter to State Sen. Nancy Skinner re Sen. Bill 1437, Apr. 16, 2018, pp. 1-2, italics added.)

"[Senate Bill 1437] would bring reform to accomplice liability and give much needed relief to people who are serving disproportionately long sentences for a homicide that person did not commit. . . .  [A] life sentence is imposed even if a person did not kill, *nor aid the killing, nor act with any intent to hurt anyone*." . . .  "[I]t is . . . critical that the punishment imposed be proportional to an individual's culpability." [¶] . . . [¶] "[T]his bill does not end criminal liability for accomplices in crime; . . . Defendants will be held accountable and will be appropriately sentenced *based on their level of participation in the homicide*."  (Sara Sindija, Re:store Justice, letter to Sen. Nancy Skinner re Sen. Bill 1437, Apr. 16, 2018, pp. 1-2, italics added.)

"SB 1437 mandates that, in order to be convicted of murder, someone *must have actually done something in furtherance of the homicide*. . . .Current law permits conviction and punishment for murder for a co-participant *who did not have the intent to*

59

*kill anyone, whose actions did not directly contribute to the death, and who did not foresee that anyone would be killed as a result of their actions*. . . . Such a result is wildly out of proportion to what this person actually did and their true level of culpability. [¶] SB 1437 *tailors punishment to the actions and intent of the individual*. . . . The penalties for murder . . . must be reserved for those individuals whose *actions and intent* warrant them." (Brendan Woods, Alameda County Public Defenders, letter to Sen. Reginald Jones-Sawyer, Sen. Standing Com. on Appropriations re Sen. Bill 1437, June 18, 2018, p. 1, italics added.)

Our interpretation of section 189(e)(2) furthers its ameliorative purposes by limiting first degree felony murder for those who do not kill to persons whose acts and intent, in combination, are commensurate with the severe penalties that accompany a first degree murder conviction.

          ii.     Legislative History

The legislative history of Senate Bill 1437 supports the conclusion that the Legislature originally intended and continued to understand and intend that section 189(e)(2) would impose liability for first degree murder on non-killers only if, with intent to kill, they aided and abetted the actual killer in the killing itself, not just in the underlying felonies.

As originally introduced, Senate Bill 1437 proposed to amend section 189 to impose new requirements limiting felony murder liability. Subdivision (a) of section 189 provided that all murder "that is committed in the perpetration of, or attempt to perpetrate" certain felonies (including robbery, burglary and kidnapping) "is murder of the first degree." (See Stats. 2018, ch. 1015, § 3(a).) The first version of the bill, dated February 16, 2018, proposed to add subdivision (e) to section 189 to limit first degree felony murder, stating, "(e) A participant or conspirator in the perpetration or attempted

perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:

"(1) The person personally committed the homicidal act.

"(2) The person acted with premeditated intent to aid and abet an act wherein a death would occur.

"(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life." (Sen. Bill 1437, (2017-2018 Reg. Sess.) as introduced Feb. 16, 2018, italics added.)

The language of section 189(e)(2) when the bill was introduced plainly was intended to limit first degree felony-murder liability for individuals who did not themselves kill to those who had a premeditated intent to kill *and* aided or abetted the act that resulted in death.

In the initial Report of the Senate Committee on Public Safety on the bill explains what it would do: "*This bill* would prohibit a participant in the perpetration or attempted perpetration of one of the specified first degree murder felonies in which a death occurs from being liable for murder, unless the person personally committed the homicidal act, *the person acted with premeditated intent to aid and abet an act wherein a death would occur*, or the person was a major participant in the underlying felony and acted with reckless indifference to human life." (Sen. Com. on Pub. Safety, Rep. on Sen. Bill 1437, as introduced Feb. 16, 2018 (Hearing April 24, 2018) pp. 2-3, 4, italics added.)

Quoting the author, the report also discusses the purpose of the bill: "SB 1437 seeks to restore proportional responsibility in the application of California's murder statute reserving the harshest punishments for those who intentionally planned or actually committed the killing." (Sen. Com. on Pub. Safety, Rep. on Sen. Bill 1437, as introduced Feb. 16, 2018 (Hearing April 24, 2018) p. 3.) The author expressed concern about current law allowing the existing felony-murder statute to be applied without culpable

intent: "California's felony murder statute has been applied even when a death was accidental, unintentional or unforeseen but occurred during the course of certain crimes." (*Ibid*.) However, the author also stated there was a need to limit felony murder to persons who played an active role in the killing: "SB 1437 clarifies that a person may only be convicted of murder if the individual *willingly participated in an act that results in a homicide* or that was clearly intended to result in a homicide." (*Id*., p. 4, italics added.)

The report also quoted arguments in support referring to the unfairness of "allowing conviction for murder without the requisite action or intent" and to "the need to reform felony murder rules" for, among other reasons, their effect on juveniles. (Sen. Com. on Pub. Safety, Rep. on Sen. Bill 1437, as introduced Feb. 16, 2018 (Hearing April 24, 2018) p. 9.) "This legislation will not eliminate criminal responsibility for accomplices in criminal activity. Participants in crime will still be held responsible for their involvement in the underlying crime, and *those who cause a death will still be liable for murder. S.B. 1437 simply reduces the unfairness of the felony murder rule by refocusing attention on the intent and actions* of the participants." (*Ibid.,* italics added.)

Three months after it was introduced, the bill was amended by the author and co-authors on the Senate Floor, apparently at the behest of the Senate Appropriations Committee. (Legis. Counsel's Dig., Sen Amend. to Sen. Bill No. 1437, May 25, 2018, pp. 1-3; Cal. Sen. J., 2017-2018 Reg. Sess., No. 205, May 25, 2018, p. 32.) The language of proposed subdivision (e)(1) of section 189 was revised to replace "The person personally committed the homicidal act" with "The person was the actual killer." (Legis. Counsel's Dig., Sen. Amend. to Sen. Bill No. 1437 (2017-2018 Reg. Sess.) May 25, 2018, p. 3.) The language of proposed section 189, subdivision (e)(2) was changed from, "The person acted with premeditated intent to aid and abet an act wherein a death would occur," to "The person was not the actual killer, but, with the intent to kill, aided, abetted,

62

counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree." (*Ibid.*)

The language of the amended version of the bill, which remained unchanged through its enactment into law, presumably was taken in part from the language of the felony-murder special-circumstance statute, section 190.2, subdivision (c). That subdivision provided in relevant part, "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4." (§190.2, subd. (c).) Like section 190.2, subdivision (c), section 189(e)(2) provided, "[t]he person was not the actual killer, but, with the intent to kill," but, instead of aiding, abetting . . . *any actor,* required that the non-killer aid, abet, . . . assist "*the actual killer* in the commission of murder in the first degree." By eliminating the requirement that the intent to kill be "premeditated," the amendment somewhat lessened the mens rea required under section 189(e)(2). If the amendment was also to reduce the actus reus required from aiding and abetting a killing to merely aiding and abetting a felony—a very significant revision to the bill that would reverse direction on the actus reus requirement by returning it to the law in effect since *Dickey*, we would expect the legislative history of the bill after the amendment to reflect this change. Instead, that history reflects that the Legislature did not intend to change the actus reus from aiding and abetting an act in which death would occur to simply aiding and abetting the underlying felony.

Four days after the bill's amendment, an analysis prepared by Gabe Caswell, Counsel to the Public Safety Committee, for the Senate Rules Committee and Third Reading of the bill, referenced the amended language, stating, "This Bill: [¶] . . . [¶] . . .

63

Prohibits a participant in the perpetration or attempted perpetration of one of the specified first degree murder felonies in which a death occurs from being liable for murder, unless the person was the actual killer or the person was not the actual killer but, *with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer*, or the person was a major participant in the underlying felony and acted with reckless indifference to human life.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 1437, as amended May 25, 2018, p. 3, italics added.) Two weeks later, the bill was referred to the Assembly Committee on Public Safety. (Final History of Senate Bill 1437.)

The Legislative Counsel's Digest, revised immediately after the bill was amended, summarized it in the same language just quoted. (Legis. Counsel's Dig., Sen. Amend. to Sen. Bill No. 1437 (2017-2018 Reg. Sess.) May 25, 2018, pp. 1-2.) The August version of the Digest retained this language and added legislative findings including, "There is a need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides" (Finding (b)); "It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability" (Finding (d)); and "A person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Second sentence, Finding (g).) (Legis. Counsel's Dig., Sen. Amend. to Sen. Bill No. 1437 (2017-2018 Reg. Sess.) Aug. 20, 2018, pp. 1-3.)

In a Background Information Request filled out by the author of the bill (Senator Nancy Skinner) at the request of the Committee on Public Safety, she stated, "It is important to note that this bill does not abolish criminal liability for perpetrators. Those who commit the actual homicide, *or who aid and abet the homicide with the intent that death occur*, or who act with reckless indifference to human life during the course of the felony will still be held responsible." (Assem. Com. on Pub. Safety, Background

Information Request on Senate Bill 1437 (Undated) p. 2, italics added.)  Later, the document states, "SB 1437 clarifies that a person may only be convicted of murder if the individual willingly participated in an act that results in a homicide or that was clearly intended to result in a homicide."  (*Id.*, p. 4.)

A memorandum from the sponsor of the bill, Re:store Justice CA, also contained in the Committee's file, stated, "SB 1437 <u>does not abolish felony murder</u>, it merely <u>limits its application</u> to those who actually killed, or who acted with an intent to kill. [¶] Thus SB 1437 is a rule of proportional responsibility.  Those who actually kill—even accidentally—during the course of a felony are still liable for first degree murder.  *Those who aid the killing with the intent to commit a murder are still liable for first degree murder*."  (Re:store Justice, memorandum re Senate Bill 1437: BESTT Practices Act (Undated) (Re:store Justice Memorandum) p. 4.)

A section entitled, "<u>Questions We May Be Asked</u>," listed the following questions and answers:

> "**Shouldn't a person be held accountable because a death occurred during the course of the crime**?" [¶] "<u>Yes</u>.  And people are being held accountable.  The person who actually committed the killing—even if the killing was accidental or unintended—is <u>still liable</u> for first degree murder under SB1437.  This does not change.  *If a person aided the killing with the intent that death occur*, <u>*that person is also still liable for first degree murder*</u>.  That does not change.  *It is only that person who neither killed, nor aided and abetted the killing who would no longer be liable for first degree murder*.  However, <u>that person is still accountable for the underlying felony, which is a strike offense</u>."  (Re:store Justice Memorandum, *supra*, pp. 6-7, italics added.)

65

"**Won't there be a lot of people seeking resentencing under the bill?  Our courts cannot handle that amount of cases**." "The only people who would be eligible for resentencing under this bill would be those who did not personally kill, *who did not aid the killing*, and who did not act recklessly to cause the homicide." (Re:store Justice Memorandum, *supra*, p. 7, italics added.) "**Wouldn't this bill let people off the hook for reckless behavior?**" [¶] "No.  The only people who would be eligible for relief are those who did NOT kill, *aid the killing*, or act with reckless disregard for human life."  (Re:store Justice Memorandum, *supra*, p. 8, italics added.)[15]

On June 26, 2018, the Assembly Committee itself issued a report on the amended bill, which stated, "According to the author, 'SB 1437 seeks to restore proportional responsibility in the application of California's murder statute reserving the harshest punishments for *those who intentionally planned or actually committed the killing.*'" (Assem. Com. on Pub. Safety, Rep. on Sen. Bill 1437 as amended May 25, 2018 (Hearing June 26, 2018) p. 4, italics added.)  It quotes the author as stating, " 'SB 1437 clarifies that a person may only be convicted of murder if the individual *willingly participated in an act that results in a homicide or that was clearly intended to result in a homicide.*' "  (*Id.*, p. 5, italics added; see also Senate, 3d reading analysis of Sen. Bill 1437, as amended August 20, 2018, pp. 1, 5, italics added [same quotation].)

Quoting one of the "Argument[s] in Support," the report states, "According to the *Center on Criminal and Juvenile Justice*, 'California's accomplice liability law can impose first degree murder charges on individuals who are accused of a felony—such as

---

[15]  This document is undated, but the bill was not referred to the Assembly Committee in whose file it was found until two weeks after it was amended.

robbery or burglary—that resulted in a death. While a murder conviction typically requires proof of premeditation and intent, the accomplice liability law creates an exception to this standard and allows the state to impose the most severe penalties, including life in prison, for the commission of a lesser offense. This life sentence is imposed *even if a person did not kill, aid in the killing, nor act with any intent to harm.* While it is important to hold those who endanger public safety accountable, punishment should be proportional to an individual's culpability. *SB 1437 will make clear that a charge of first degree murder requires that someone had intent to kill, aided and abetted the killing*, or acted with reckless indifference to human life." (Assem. Com. on Pub. Safety, Rep. on Sen. Bill 1437 as amended May 25, 2018 (Hearing June 26, 2018) p. 7, italics added.)

A report prepared for the Senate Rules Committee analyzing the amended bill states, "This bill: [¶] . . . [¶] 3) Prohibits a participant in the perpetration or attempted perpetration of one of the specified first degree murder felonies in which a death occurs from being liable for murder, unless the person was the actual killer or *the person was not the actual killer but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer*, or the person was a major participant in the underlying felony and acted with reckless indifference to human life." (Sen. Rules Com., Office of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 1437, as amended May 25, 2018, p. 3, italics added.)

### d. Conclusion

Based on the language of section 189(e)(2) and its statutory context, as well as the broad ameliorative legislative purposes and the history of Senate Bill 1437, and our consideration of the Fourth District's varied opinions interpreting this provision, we conclude that the meaning of section 189(e)(2) is as Jackson contends: the currently valid theory of felony-murder liability for a non-killing accomplice in the underlying

67

felony or felonies requires a determination that the accomplice both intends to kill and acts accordingly to aid, abet, encourage, solicit, assist etc. in the killing of the murder victim. Jackson's jury was not instructed that in order to find the felony-murder special circumstance true, it had to find he aided and abetted the killing, not just the robbery or burglary, and we cannot conclude it must have found the former. As we have explained, at the time of the Castaneda, Treas and Blackmon murders, the Supreme Court had interpreted the special circumstance language of section 190.2, subdivision (b) (later renumbered 190.2, subdivision (c)) to require a defendant who was an accomplice and not the actual killer to harbor the intent to kill but to aid and abet only the underlying felony. (*Dickey, supra,* 35 Cal.3d at p. 900.) As we have also explained, that rule resulted from the Supreme Court's reversal, in *Dickey,* of its previous interpretations of the same special circumstance language. If the evolution of the high court's understanding of the felony-murder special-circumstance statute teaches anything, it is that over time the meaning of the special circumstance requirements has been understood quite differently, even by our judiciary. If justices and courts can differ on the meaning of the language, so may legislators and jurors. For that reason, we certainly cannot conclude beyond a reasonable doubt that reasonable jurors instructed as Jackson's were on the felony-murder and multiple-murder special circumstances would have understood the defendant had to aid and abet the killing itself.

We must therefore remand this case to the trial court to apply that interpretation of section 189(e)(2) and decide whether the evidence proves beyond a reasonable doubt that Jackson "aided, abetted, . . . or assisted" in the killings of Treas and Castaneda.

## DISPOSITION

The trial court's decision to deny the petition as to the Blackmon murder is reversed and the matter is remanded for the court to hold a hearing consistent with this opinion. The trial court's decision to deny the petition as to the Castaneda and Treas

68

murders at the prima facie stage is reversed and the matter is remanded for the trial court to issue an order to show cause and hold a hearing consistent with this opinion.

 

 

_____

STEWART, P. J.

We concur.

_____

RICHMAN, J.

_____

MILLER, J.

*People v. Jackson* (A164679)

Trial Court:  Contra Costa County Superior Court

Trial Judge:  Hon. Charles B. Burch

Counsel:

James S. Donnelly-Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Bridget Billeter and Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent.